Clair B. BADER, Executor of Estate of E. G. BADER, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Clair B. BADER and Margaret Bader, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 1717, 1850.

United States District Court
S. D. Illinois, N. D.

March 26, 1959.

Lachlan Crissey, Lewistown, Ill., for plaintiffs.

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., Arthur Biggins, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

MERCER, Chief Judge.

The above-entitled actions have been consolidated for trial and the cases have been tried. In Civil Action No. 1717, taxpayer, Clair B. Bader, sues in his representative capacity as the duly appointed Executor of the estate of his father, E. G. Bader, the decedent. The decedent died on June 2, 1951 and the taxpayer as Executor filed an estate tax return on July 25, 1952 in which return he included as property owned by the decedent on the date of his death, 77 shares of stock in Bader and Company, this being a corporation engaged in the grain, feed and elevator business, said business having been founded and managed by the decedent. In due course of time the estate tax return was audited which resulted in a determination by the Commissioner of Internal Revenue that the fair market value of this stock on June 2, 1951 was $1,250 per share. A deficiency was asserted against the estate based on this valuation and said deficiency was paid in full. In this action the taxpayer contends that the value determined by the Commissioner was erroneous and that the fair market value of these 77 shares of stock on the date of decedent's death was actually $521.83 per share. On July 30, 1954 taxpayer filed a timely claim for refund and upon the Commissioner's failure to act favorably on taxpayer's claim for refund the present action was instituted. The only issue presented in this case is the fair market value for federal estate tax purposes of 77 shares of common stock of Bader and Company owned by the decedent on June 2, 1951, the date of his death.

In Civil Action No. 1850, taxpayers Clair B. Bader and Margaret Bader, sue in their own names for their own benefit. Decedent and his brother were the principal shareholders in equal shares of Bader and Company, Vermont, Illinois,

and the Bader Motor Company, Astoria, Illinois. The taxpayer, son of E. G. Bader, the decedent, worked for both corporations prior and subsequent to 1937. The taxpayer apparently dissatisfied with a salary of $150 per month, motivated him in 1937 to start seeking other employment. The decedent, desiring his son to continue with the business and to induce him to stay, signed an agreement on June 10, 1937 which provided as follows:

"June 10, 1937

"Astoria, Illinois

"This agreement entered into between E. G. Bader and my son, Clair B. Bader, June 10, 1937. It is understood that if he continues to work for the companies 10 years I will give him a bonus of $5,000.00 (Five Thousand Dollars) in cash or the equivalent of stock in either companies. Stock to be valued at $100.-00 par value. The choice being up to my son.

"S/ E. G. Bader"

The taxpayer worked the period of ten years and accordingly on May 2, 1949 he received 40 shares of Bader and Company stock and 10 shares of Bader Motor Company stock. In connection with an audit of the estate tax return involved in Civil No. 1717, the Commissioner determined that this stock constituted additional 1949 income to the taxpayer. No dispute exists as to the value of the 10 shares of Bader Motor Company stock and the parties agree that this stock was worth $250 per share on May 2, 1949. A dispute exists as to the fair market value on May 2, 1949 of the 40 shares of Bader and Company stock, the government contending that the value of these shares on the date in question was $1,250 and the taxpayer contends that the fair market value on May 2, 1949 of said shares was $416 per share, this being one-third of an alleged $1,250 book value of such shares of stock in 1949.

In the original audit of taxpayers' 1949 income tax return, the examining revenue agent allowed and computed the taxpayers' income tax on a long term basis covering the ten years from June 10, 1937 to June 10, 1947. On review of this finding the Appellate staff of the Internal Revenue Service determined that this case was not a proper one for application of Section 107(a), Internal Revenue Code of 1939, 26 U.S.C.A. § 107(a). This determination was based upon the fact that the other compensation received by the taxpayer during the 1937 to 1947 period, being the salary from the two corporations, was sufficiently large so as to constitute more than 20% of the taxpayer's total compensation for this period. The taxpayer contends in this action that the taxpayer's corporate salary can not be used to apply against the limitation of compensation received in excess of 20 per cent for the reason that the compensation and stock was from a different source than the compensation in salary.

■ The taxpayer filed a timely claim for refund, the claim being based on the allegations that the Commissioner had overvalued the Bader and Company stock as of May 2, 1949 and that the Commissioner had erred in including in the taxpayer's compensation the salary received by him for the ten year period for the purpose of determining whether the taxpayer had received over 80 per cent of his total compensation for services in one year.

The taxpayer's claim for refund was disallowed and the suit in Civil Action No. 1850 followed. Two issues are presented in this case, namely, the fair cash market value of the Bader and Company stock, being 40 shares, on May 2, 1949, and the applicability or inapplicability of Sec. 107(a), or, stated in another way, whether the salary received by the taxpayer from his employer corporations should be counted toward the 80 per cent limitation contained in Sec. 107(a) of the Internal Revenue Code of 1939, when he was paid in one year (1949) for ten years' services to such corporations.

■ The stock involved herein was not listed on an exchange; was not trad-

ed over the counter; was rarely purchased or sold and was owned by a small number of persons. For these reasons it is clear that during the years in question Bader and Company was a close corporation. Consequently, it is necessary to resort to the opinion of experts to establish the fair market value of the blocks of stock involved herein. Each party produced one expert witness, the plaintiff a Mr. William E. Stiegelmeier of Chicago, Illinois, and the government, Mr. David Checkman, a long-time employee of the government in the Internal Revenue Service.

■ Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither of whom is under any compulsion to buy or to sell and both of whom are reasonably well informed as to the facts having a bearing on value.

The Commissioner of Internal Revenue in Revenue Ruling 54–77 (1954) provides that the following factors are fundamental and require careful analysis in each evaluation case:

(a) The nature of the business and the history of the enterprise, including the date of incorporation.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend paying capacity.

(f) Good will.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business which are listed on an exchange.

The ruling also provides "depending upon the circumstances in each case certain factors may carry more weight than others because of the nature of the business".

■ In seeking an answer to the valuation question involved, the court will follow as closely as possible the suggestions contained in the above quoted revenue ruling issued by the Commissioner of Internal Revenue on March 1, 1954. Unfortunately there are no grain elevator companies, either large or small, with stock held publicly and actively traded. Since this condition exists, reliance must be placed upon general knowledge of the market for stocks of small, closely-held companies and the opportunities in alternative investments. I am of the opinion that the major factors to be considered are book values, earning power and dividend capacity. Both of the parties have correctly placed emphasis on the three major factors above mentioned as shown by Table 17 hereafter referred to. Book value is a factor to be considered, still it is not a reliable measure of fair market value. I am certain the investor is inclined to give earning power and dividend prospects much more weight in appraising the worth of any security. What the buyer is acquiring are the profits and dividends which the business will provide in the future. It necessarily follows that a proper appraisal of a stock requires an estimate of future earning power and dividend prospects and the establishment of a proper ratio between these factors and the price per share which a potential buyer would be willing to pay for the stock. The potential buyer would necessarily give consideration to the background of the company, quality of the management, nature of the business, extent of facilities, working capital, trend of sales, expense of operation, prospects for future earnings and dividends.

*Working Capital*

Bader and Company was in a reasonably strong financial condition on May 2,

1949; at fiscal year end, April 30, 1949, there was $227,329 of net working capital, this being 7.6% of the 1949 gross sales. It's current ratio was 12.5 to 1. The working capital was well distributed between cash, receivables and inventories as shown in Appendix B admitted into evidence.

On the second valuation date, June 2, 1951, the Company was in a less favorable position. Cash declined to less than 1% of sales compared with a maximum desired level of at least 2%. There was a large increase in accounts payable and accrued taxes and the Company showed a current ratio, of only 3.1 to 1 on April 30, 1951. It is of great significance from the standpoint of risk that the Company in May, 1951, committed itself to a $125,000 plant expansion program. At the time of the second valuation date the company was seeking a term loan and a line of credit to finance an expansion of the soybean operation. A Chicago bank agreed to finance to the extent of $75,000 on a three year term loan basis, provided the stockholders would buy additional stock in the amount of $50,000, which would amount to $200 per share. A line of credit was also granted the Company for the purchase of soybeans. The loan agreements prohibited the payment of common stock dividends except with the written consent of the bank. In view of this required financing it seems to me that a purchaser of common stock of Bader and Company on June 2, 1951 would have faced a possible assessment of at least $200 per share in order to complete the soybean plant.

Further evidence discloses that in comparison with 80 other small elevators, operating principally in Illinois and Indiana, the working capital of Bader and Company was about 14% below average in 1951 and its total invested capital was 10% below the industry average in relation to sales.

*Future Earning Power Basis*

Table 11 introduced into evidence discloses that Bader and Company had high earnings during the years 1947, 1948, 1950 and 1951. Earnings resulted from a favorable situation in the soybean market. The table shows a close relationship between the Company's net profit before Federal income taxes and the increase in the price of soybeans during the same season. For example—between October, 1945 and April, 1946, the price of soybeans on the Chicago market rose 11 cents per bushel or about 5%. In that year Bader and Company reported net profit, before taxes, of $23,319. During the following season between October, 1946 and April, 1947, bean prices rose 62 cents per bushel or 22% in price. In that year the Company earned $99,723 before taxes. Two years later, with a decline in prices, the profits were reduced to $42,816. The same Table 11 discloses that the years 1947, 1948, 1950 and 1951, were peak years for all soybean operations but there was no justification in assuming that the large price increases between harvest time and the spring of the following year would continue.

On May 2, 1949, with a poor record for the preceding fiscal year, it would appear that the Company could not have earned more than $55,000 to $60,000 with a normal rise in soybean prices between harvest time and the following year. Based on a net profit before taxes of $58,400, the common stock would have shown earnings of $110 per share. On the second valuation date, June 2, 1951, the basic factors were unchanged despite the high speculative profits enjoyed during the two preceding years. In addition, salaries had been increased substantially and the interest charges on the soybean plant financing would amount to over $6,000 per year. Considering these factors expected future net earnings before taxes would approximate $53,200 a year and this would have produced earnings per share on the common stock of $100 per year.

*Dividend Paying Capacity Basis*

With prospective earnings of $110 a share in 1949, the Company would have been justified in continuing its dividend rate of $30 a share per year. On June 2, 1951, due to the large expansion pro-

gram and the weak financial condition of the Company, it was not in a position to maintain dividends at the rate paid in 1951 which was $40 a share. Future dividends for several years in the future would probably average no more than $25 a share annually, for the reason that they were restricted during the period of the bank loan. The government contends that the Company had an average dividend capacity of $83 on each of the valuation dates involved. To derive a 6% yield for 1949 and a 5.45% yield for 1951, as suggested by plaintiff's witness, Mr. Stiegelmeier, the price a potential investor would pay for the shares as of May 2, 1949, would be $1,375.00 and as of June 2, 1951, the price of $1,525. The government contention does not appeal to me to be realistic and the opinion of Mr. Stiegelmeier demonstrates some realism, therefore, I am constrained to give credibility to his testimony and the dividend basis set forth in plaintiff Table 15 is adopted by the Court.

*Book Value Basis*

The plaintiff contends that Bader and Company common stock had a book value of $1,320 a share on May 2, 1949 and $1,625 a share on June 2, 1951. The further contention is made that appendix D, page 2, discloses that stocks of the large integrated diversified grain, flour and feed companies were selling at an average of 159% of book value in 1949 and 1951. During these same periods the stock of the medium and small medium companies were selling at about 60% of book value. The plaintiffs conclude that, on this basis, the stock of Bader and Company would be worth about 50% of book value on May 2, 1949 and because of the increased risk, about 45% of book value on June 2, 1951. On this basis the stock would have a value of $660 on the first valuation date and $730 per share on the second valuation date.

The government's chief quarrel with Mr. Stiegelmeier's method of evaluating the fair market value of the shares, using book values, is with the discounting he employed. At the same time the government's brief states, "it is not the government's contention that the book value and market value are the same, only that book value is one factor to be considered in determining fair market value." I feel it is wholly unrealistic to find in accordance with the evidence that book values should not be discounted. I find, on the contrary, that they should be discounted and the extent of discount remains as the salient question. The plaintiff discount at the rate of 50% on the first valuation date and 45% on the second I find to be higher than justified and further find that the book value should be discounted 40% on the first valuation date and 35% on the second. I further find the book value as of May 2, 1949 was $1,320 and as of June 2, 1951 was $1,785. The latter figure is increased $160 per share over the plaintiff's figure of $1,625 per share because of the $40,000 inventory adjustment which was made when the corporation changed its accounting method of inventories. I have computed a Table 15 which discloses my computations on the book value basis as well as the earning power basis, dividend basis and discount for lack of marketability. The Court's Table 15 includes the valuations as determined from the evidence and constitute findings of fact.

*Discount for Lack of Marketability*

The government does not dispute that the sale of a minority interest, and the lack of marketability of stock in a close corporation, detract from the value of such stock. However, the government contends that these factors have already been taken into consideration and that the 25% discount calculated in Table 15 represents a duplication of discounts which were figured in arriving at the various averages contained in the Table. This contention has merit and I find that the weighted averages should be discounted by 10% to reflect the unusual lack of marketability of Bader and Company shares. This finding is reflected in the Court's Table 15.

### Plaintiff's Table 15

| Indicated Value per Share | Weight | May 2, 1949 | June 2, 1951 |
|---|---|---|---|
| (1) Earning Power Basis | 2 | 550 | 550 |
| (2) Dividend Basis | 1 | 450 | 450 |
| (3) Book Value Basis | 1 | 660 | 730 |
| Weighted Average | | 552 | 570 |
| Discount for Lack of Marketability | (25%) | 138 | 142 |
| Fair Market Value | | 414 | 428 |

### Defendant's Table 15

| Indicated Value per Share | Weight | May 2, 1949 | June 2, 1951 |
|---|---|---|---|
| (1) Earning Power Basis | 2 | 550 | 1650 |
| (2) Dividend Basis | 1 | 1375 | 1525 |
| (3) Book Value Basis | 1 | 1320 | 1785 |
| Weighted Average | | 945 | 1652 |
| Discount for Lack of Marketability | (15%) | 145 | 247 |
| Fair Market Value | | 800 | 1405 |

### The Court's Table 15

| Indicated Value per Share | Weight | May 2, 1949 | June 2, 1951 |
|---|---|---|---|
| (1) Earning Power Basis | 2 | 550 | 710 |
| (2) Dividend Basis | 1 | 450 | 450 |
| (3) Book Value Basis | 1 | 792 | 983 |
| Weighted Average | | 585 | 713 |
| Discount for Lack of Marketability | (10%) | 58 | 71 |
| Fair Market Value | | 527 | 642 |

Having decided the valuation questions involved in both cases, I will now consider the second issue involved in Case No. 1850 which involves the applicability or inapplicability of Section 107(a), Internal Revenue Code of 1939, to the 50 shares of stock received on May 2, 1949. The only question involved is whether the compensation received by the taxpayer from Bader and Company is to be considered as part of his total compensation received by way of bonus and would therefore be charged against the 20% that can be received over a period of time prior to the final payment. If the taxpayer's salary received from the two corporations is to be counted in a computation, taxpayers have not met the requirement that the bonus payment representing compensation for at least 36 months (here 10 years) must be at least 80% of the total compensation. In order to prevail, taxpayers have the burden of proving that the salary received by the taxpayer in each of the years 1937–1947 is not to be included in a Section 107(a) computation for the reason that said compensation was not

from the same source as the transfer of stock. Thus, the Court's decision is purely a factual one.

The agreement of Mr. E. G. Bader is heretofore set forth. It is obvious that the agreement was prepared by the father who did not have the services of a lawyer. As a result the agreement is not skillfully drawn and in my opinion is full of ambiguities. The contract does not speak for itself. To ascertain the intention of the parties and to get to the simple truth, the Court must investigate the external circumstances as disclosed by the evidence. This I have done and I am convinced and so find that the two sources were separate and distinct. The salary was paid by Bader Motor Company in which E. G. Bader, the father, had less than one-half interest, and the other side of the family had a one-half interest. The stock was given to Clair B. Bader by his father, E. G. Bader, from his own personal holdings. The government recognized this as a proper deduction from the E. G. Bader individual income tax return when it allowed a refund of $6,400 on account of this transfer. This circumstance is of great significance. It is further apparent to the Court that the services performed by Clair B. Bader for his father individually and for which the transfer was made, were entirely separate from the services which he furnished to Bader Motor Company, the corporation. It is therefore, the opinion of the Court that plaintiffs have sustained their burden of proof and are entitled to the benefit of the provisions of Section 107(a) of the Internal Revenue Code of 1939.

■ Another question raised by the pleadings is whether or not the income of Clair B. Bader received under the provisions of Section 107(a), should be divided equally between Clair B. Bader and his wife, Margaret Bader, under the marital provision. Apparently the government has abandoned their position that it could not be split as this matter was not argued in the government brief. There would appear to be little question that this question is answered in the case of Hofferbert v. Marshall, 4 Cir., 200 F.2d 648.

The plaintiffs are entitled to have the income split between the husband and wife.

■ One other matter should be passed on, namely, the objections of the government to the testimony of the witness, Mr. Castiendyck. The Court heretofore reserved its ruling on this objection. I am of the opinion that the objection should be and the same is sustained, this being on the basis that Mr. Castiendyck's testimony is not pertinent to the issues involved in this case and should not be given any weight by the court. The valuation of the stock must be made as of the relevant dates without regard to events occurring subsequent to the crucial dates.

The findings of fact and conclusions of law appear in this opinion and should be considered as a compliance with Rule 52, F.R.Civ.P., 28 U.S.C.A.

In view of the complicated computations necessary to determine the amount of the refunds in each of these cases, the Court directs the plaintiffs and the government to present, if possible, a mutually agreeable computation based upon the values, findings and conclusions as herein indicated so that judgment may be entered in accordance with the foregoing opinion. The order shall be presented to the court within a period of 30 days from this date.