## Binenstock Trust

*Harry Shapiro, Frank F. Truscott* and *Austin M. Lee,* for exceptants.

*Cuthbert H. Latta, Israel Packel, Nathan L. Posner* and *Fox, Rothschild, O'Brien & Frankel,* contra.

BURKE, J., June 8, 1962.—On March 22, 1962, I entered a decree approving the sale of 325 shares (total outstanding) of the stock of J. A. Dougherty Sons, Inc., Distillers, to Publicker Industries, Inc., for $1,411,000, which was the higher of two sealed bids submitted in accordance with the specifications prescribed in my interlocutory decree of March 15, 1962.

Certain of the parties in interest filed exceptions to the final decree, and a petition to reopen the hearings before me was submitted to the court en banc on behalf of Theodora B. Jacobs, beneficiary and one of the trustees, to afford petitioner an opportunity to offer further testimony to show that the sale is not in the best interest of the trust.

The matter was referred back to me by the court en banc, per decree of Judge Shoyer, for the limited purpose of holding hearings forthwith to enable the petitioner to offer further testimony in support of the averments in the petition.

Among other things, petitioner averred that the price was inadequate. She produced no evidence whatever to support this averment, nor did she offer any testimony to show that a higher price could be obtained. In fact she, as one of the trustees, asked the court to approve the original offer of $1,250,000. One of the witnesses called by the petitioner testified that he had been consulted by a prospective purchaser about eight months previously to make an appraisal of the corporation and that he had advised the prospect that the business was worth between $900,000 and $1,000,000. He stated, however, that the potential of the business warranted holding the stock, and speculated that if the indebtedness could be discharged by financing, the business might be worth $4,000,000 within four years.

Another witness, a vice-president of a large financial institution, who had been consulted by petitioner about a loan, testified that he would recommend a loan of

$500,000 on a one-year basis to liquidate the indebtedness of $915,000, if the balance of $415,000 could be provided from other sources. This proposal merely substitutes debts for debts. If the $500,000 debt were not paid at the end of the year, the bank, of course, could liquidate the loan, and the junior lien holder could thus acquire full ownership of the business for $915,000. Such an eventuality in this highly competitive business would cost the trust estate $496,000. Obviously, the plan hardly commends itself to prudent trustees.

The dominant theme of petitioner's case is that if the trustees would effect a refinancing of the corporation in lieu of a sale, a roseate future would follow providing earnings sufficient not only to redeem the newly created debt, but also sustain payments of substantial dividends to the beneficiaries.

Albert Barnes Zink, Esq., one of the trustees and tax attorney for the trust, was called by petitioner in cross-examination. He was asked a hypothetical question as to profit consequences if the corporation should have a net profit of $300,000 in one year and distributed $150,000 to the beneficiaries or to the trust. Mr. Zink replied that from such a net profit the balance after taxes would be approximately $40,000.

The hypothetical net income of $300,000 is far in excess of that of the corporation's banner years. Assuming, however, that such profits could be realized and maintained, it would require almost a quarter of a century to discharge the obligation of $915,000. Obviously, petitioner does not have a full appreciation of the impact of taxes.

Petitioner claims that the original offer of $900,000 for 75 percent of the stock, with the right in the trustees to require the purchasers to buy the remaining 25 percent within three years for $350,000, a total of $1,250,000, is more beneficial to the trust estate than

an immediate sale of all the stock for $1,411,000 in cash. Assuming that the trustees did not demand the purchasers to buy the remaining 25 percent of the stock within the period provided, the trust would be saddled with a $350,000 investment in a minority interest in a close corporation. It is difficult to understand how such a plight would be for the best interests of the trust estate.

Petitioner objects that a relatively small portion of the purchase price of $1,411,000 will remain in the trust for the beneficiaries after payment of settlor's obligations. Be that as it may, a settlor must be just before he is generous.

All of the life-tenants, excepting Theodora B. Jacobs, and all of the remaining trustees, excepting Mrs. Jacobs, approve the sale of the stock to Publicker Industries, Inc., for $1,411,000, and in the absence of any evidence that a better price can be obtained, I am of the opinion, and so find, that the sale is for the best interest of the trust estate, and accordingly I confirm my decree entered on March 22, 1962.

*Opinion Sur Exceptions*

Before Klein, P.J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

SHOYER, J., June 27, 1962.—By decree dated March 22, 1962, Judge Burke, the hearing judge, confirmed the sale of 325 shares (total outstanding) of the stock of J. A. Dougherty's Sons, Inc., Distillers, to Publicker Industries, Inc., for $1,411,000. These shares constitute substantially the entire res of this trust. Terms of the sale provide for a down payment of $50,000, which has been paid, and payment of the balance on or before July 5, 1962.

The sale was approved by Girard Trust Corn Exchange Bank, John Tait and Albert Barnes Zink, three of the trustees. Exceptions have been filed on behalf

of Theodora B. Jacobs, the fourth trustee, who is also a beneficiary, her son, Robert Henry Jacobs, also a beneficiary, and Lester J. Schaffer, guardian and trustee ad litem. These exceptants are all represented by Harry Shapiro, Esq. Exceptions were also filed on behalf of the Commonwealth of Pennsylvania by its escheators, Frank F. Truscott and Austin M. Lee.

Argument on these exceptions was heard by our court en banc on April 16, 1962. Mr. Shapiro, along with his argument, urged this court to entertain a petition, belatedly filed by him, seeking permission to introduce further testimony that the purchase price of $1,411,000 was inadequate for trust purposes.

By decree of April 27, 1962, this court, with the consent of the learned hearing judge, and without disturbing his decree of March 22, 1962, referred the matter back to Judge Burke "for the limited purpose of holding hearings forthwith to enable Robert Henry Jacobs, Theodora B. Jacobs and Lester J. Schaffer 'to offer further testimony' (subject to rebuttal) in support of the allegations in their petition, to the end that the learned hearing judge may determine whether there is any merit to petitioner's allegations."

Following the holding of additional hearings, Judge Burke concluded, as he had previously, that the sale to Publicker Industries, Inc., for $1,411,000 was "for the best interest of the trust estate" and, on June 8, 1962, confirmed his decree of March 22, 1962.

This court, sitting specially en banc, has now heard argument by Mr. Shapiro sur the exceptions filed on behalf of his clients to the opinion of Judge Burke, filed June 8, 1962, and also reargument on the exceptions to his decree of March 22, 1962.

It is the unanimous opinion of this court that the learned hearing judge was correct in holding that the sale of 325 shares of the stock of J. A. Dougherty's Sons, Inc., Distillers, to Publicker Industries, Inc., for

$1,411,000, was for the best interest of the trust estate, that there was no abuse of discretion on the part of a majority of the trustees in seeking a sale at the highest possible price, that such price has been obtained and the same is adequate to fully protect the rights of the Commonwealth asserted by its escheators, Frank F. Truscott and Austin M. Lee. An opinion setting forth our reasons in full for reaching this conclusion will be filed at an early date.

Therefore, we enter the following

### Decree

And now, June 27, 1962, all exceptions to the decree of Judge Burke, dated March 22, 1962, and his opinion filed June 8, 1962, are dismissed. The dismissal of the exceptions filed on behalf of the Commonwealth of Pennsylvania is without prejudice to its right to pursue and enforce any and all claims, interests and rights, which it now has or had with respect to the 325 shares of the stock of J. A. Dougherty's Sons, Inc., Distillers, owned by the trust estate, against the proceeds of the sale of said stock to Publicker Industries, Inc.

### Opinion sur Exceptions

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

SHOYER, J., August 7, 1962.—In stating our reasons in support of our definitive decree of June 27, 1962, we include by reference the statement of facts prefacing our decree of April 27, 1962. We shall take up first the exceptions filed by the Commonwealth through its escheators, Frank F. Truscott and Austin M. Lee. They are twofold: alleging lack of jurisdiction in this court because of a pending proceeding (in equity) filed by the Commonwealth in the Court of Common Pleas No. 1 of Philadelphia County; and, secondly, an asserted bar in the "Security Agreement" of October 17,

1951, entered into by the trustees on the one part and the Commonwealth on the other, after permission granted by this court as of October 5, 1951.

Because the original escheat proceeding, out of which the judgment against Binenstock grew, was commenced on June 21, 1943, in the Court of Common Pleas No. 1 of Philadelphia County, the escheators contend that all further proceedings in execution or satisfaction of that judgment must also be channeled through that court. Nothing could be further from the truth, especially where the rights of innocent third parties are involved.

The instant trust was never involved in the escheat proceedings. When Binenstock asserted his inability to pay the escheat judgment of $864,924.01, affirmed by our Supreme Court on January 8, 1951 (366 Pa. 519, see the statement of facts prefacing our decree of April 27, 1962), the Commonwealth threatened to attack this trust by proceeding under the Uniform Fraudulent Conveyance Act. The subsequent settlement, reducing Binenstock's liability to $756,000, was embraced in two written agreements, both dated October 17, 1951. There were only two parties to the settlement agreement proper, namely, the Commonwealth and Binenstock. The "Security Agreement", on the other hand, joined the trustees with Binenstock as co-covenantors. While the settlement agreement fully acknowledges Binenstock's obligation to the Commonwealth, the "Security Agreement" in marked contrast recites: "6. The execution of this agreement by the Trust Principals shall not be deemed or construed to be an admission by them or any of them that the aforementioned Indenture of Trust was made and executed under such circumstances as to enable the Commonwealth to establish its invalidity and to have it declared null and void under the provisions of the Uniform Fraudulent Conveyance Act."

It thus becomes clear that this court obtained unquestioned jurisdiction over this trust in 1951, when the application for approval was made by the trustees. We have maintained jurisdiction ever since, as shown by the subsequent events. In May, 1956, the trustees' first account was filed here under the same 1951 docket number. In June, 1956, Lester J. Schaffer, Esq., was appointed guardian and trustee ad litem in connection with the audit, and with full authority to act in the disposition of any questions affecting the trust that might arise before the audit is completed. In August, 1961, the petition for removal of Mrs. Jacobs' three sisters as co-trustees was filed here and granted. Not until October, 1961, did the Commonwealth seek to have the common pleas assert jurisdiction over this trust. Its bill in equity was assigned to Court of Common Pleas No. 1, the same court in which the escheat proceedings were finally prosecuted to judgment in December, 1949. Docketing there of the complaint in equity as of September term, 1961, no. 906, clearly establishes the lack of any connection of this trust with the earlier escheat litigation.

This court, under section 301(3) of the Orphans' Court Act of August 10, 1951, P. L. 1163, 20 PS §2080.301(3), as amended on February 10, 1956, P. L. 1022, has exclusive (formerly concurrent) jurisdiction over inter vivos trusts unless "another Pennsylvania court" had acquired jurisdiction over the trust prior to the amendment. As stated by our Supreme Court, the exclusive jurisdiction which the statute conferred "of necessity includes any matter which concerns the integrity of the trust res—its administration, its preservation and its disposition . . .": Wilson v. Board of Directors of City Trusts, 324 Pa. 545, 551. Should the Commonwealth seek a decree of this court setting aside this trust as fraudulent, we would have jurisdiction to entertain such a suit: Kenin's

Estate, 41 D. & C. 572, 578-79, affirmed 343 Pa. 549 and 567; Goldstein's Estate, 29 D. & C. 536, 540-42. See also Fisher Estate, 26 D. & C. 2d 351, 357-60.

What more then needs to be said to confirm our jurisdiction? We can add that both "the administration of a trust" and the common pleas suit "to assume the possession and control of specific . . . property" are actions *quasi in rem:* Mathew's Trust Estate, 339 Pa. 219, 222; Thompson v. FitzGerald, 329 Pa. 497, 507. Both proceedings involve the same res—viz., the entire corpus and income of the trust and "In such cases . . . the rule is that the court which first acquires jurisdiction of specific property by the possession thereof, or by the commencement of a suit from which it appears that it is necessary to a determination of the controversy, or to the enforcement of the prospective judgment or decree, for the court to have control and dominion over the property, thereby withdraws it from the jurisdiction of every other court so far as is necessary to accomplish the purpose of the suit, and the court is entitled to retain such control as is requisite to effectuate its final judgment or decree free from the interference of every other tribunal. 'That *res* is as much withdrawn from the judicial power of the other [court], as if it had been carried physically into a different territorial sovereignty'. . . The tribunal whose jurisdiction first attaches 'holds it to the exclusion of the other until its duty is fully performed and the jurisdiction invoked is exhausted'. . .": Thompson v. FitzGerald, supra, 505-06.

In this court we have had "successive steps . . . in the administration of [this] trust [which] constitute but a single legal proceeding": Mathew's Trust Estate, supra, 223. The first step was taken in 1951, ten years before the equity suit in common pleas.

In fact, we have acquired in our supervision of this trust a "right of way" so broad that upon precedent

we can, if necessary, enjoin the Commonwealth from further proceeding in the common pleas: Thompson v. FitzGerald, supra, 514; Craig Estate, 379 Pa. 157, affirming 3 D. & C. 2d 381; Alexander's Estate, 214 Pa. 369. See Sheehan Estate, 78 D. & C. 385, 386.

The "Security Agreement" in paragraph 3 provides that "so long as any indebtedness" of Binenstock "shall remain unpaid" the trustees "shall not sell . . . any asset of the trust . . . without the consent in writing of the Commonwealth." In its insistence upon this section as posing an insurmountable bar to the present sale, the Commonwealth resolutely ignores paragraph 2 which expressly permits "distribution or disposition" by the trustees when "ordered and directed by the final judgment or decree of a court of competent jurisdiction."

The authorization granted by paragraph 2 would seem in and of itself to be sufficient answer to the Commonwealth's contention. But a reading of the "Security Agreement" from its four corners establishes clearly that its sole purpose is to provide *security* to the Commonwealth and nothing more. We do not understand that these exceptants contend that the agreement does stand for anything more. The Commonwealth simply refuses its consent until its debt is paid, —an arbitrary position to say the least, since the very language of paragraph 3 continues the Commonwealth's power to refusal only so long as the indebtedness remains. Graciously, the Commonwealth is willing to consent when its consent becomes unnecessary.

In holding to its capricious position, the Commonwealth is "wresting the words relied on from their subject-matter and obvious purpose. It is axiomatic that this can never be done; all contracts must be construed with reference to their subject-matter and obvious purpose, and, however general the language may be, their scope and effect are necessarily limited and controlled

thereby": Camden Safe Deposit & Trust Co. v. Eavenson, 295 Pa. 357, 363.

Furthermore, contracts must receive a reasonable rather than a harsh interpretation: Percy A. Brown & Co. v. Raub, 357 Pa. 271, 287; Markides v. Soffer, 172 Pa. Superior Ct. 215, 218; Stoner v. Bellows, 196 F. 2d 918, 921 (C.C.A. 3rd, 1952); Restatement, Contracts, §236(a).

We emphasize that the "Security Agreement" does not of itself obligate the trustees to pay anything at all to the Commonwealth. A careful reading of the whole agreement shows its purpose and effect were solely to preserve the trust as a source from which the Commonwealth might collect if it could establish either that the trust was created in fraud of its rights as a creditor *or* that the escheated funds had gone into the trust. So far, it has not established either allegation.

To move a court of equity to enforce this negative covenant as the Commonwealth insists, a complainant must show that his adversary's proposed conduct will cause him irreparable damage if not enjoined,—that his own injury will exceed that to be suffered by the other party if enjoined. "A mere legal right in the plaintiff will not move the Chancellor", especially "if the plaintiff attempts to enforce the covenant in a manner which results in more injury to the defendants than benefit to the plaintiff": Plymouth Woods Corporation v. Maxwell, 407 Pa. 539, 542.

At the reargument before our court en banc, Mr. Truscott conceded that the conversion of the stock into cash would improve the Commonwealth's position provided the entire fund was maintained intact. We have given full and complete protection to the Commonwealth's rights in our definitive decree of June 27, 1962. This protection extends to thorough and careful judicial consideration by us of the Commonwealth's assertion that the deed is invalid, whenever these excep-

tants may request such a hearing. As stated by Judge (later Mr. Justice) Stearne: "When, therefore, the trustee filed its account in this court, the orphans' court assumed complete jurisdiction over the subject matter. It is a well-settled principle that a court of equity, when its jurisdiction has been invoked for any equitable purpose, will proceed to determine any other equities existing between the parties connected with the main subject of the suit, and grant all relief necessary to an entire adjustment of such subject . . .": Kenin's Estate, supra, at page 579. This case holds expressly that such relief includes all the protection afforded by the Uniform Fraudulent Conveyance Act.

We now turn to the exceptions of the Jacobs family, which are joined in by the guardian and trustee ad litem. They attack the order of the hearing judge, which confirmed the Publicker sale, as being harmful to the purposes of the trust in that there will be too little cash left to permit the trust to continue after the claims of the creditors and the administration expenses are taken out.

Before reviewing these exceptions, it is well to point out that Mrs. Jacobs had earlier joined with the other trustees in their decision that the only solution to the urgent problem besetting the trust—viz., the demands of the Commonwealth and the Federal tax authorities, totalling some $915,000—was the sale of the Dougherty stock. Her husband, Allen, the president of Dougherty, had been given an exclusive 90-day agency to get a buyer as far back as June 14, 1961. His immediate efforts were directed to protecting his own job as president (salary $30,000) by trying to raise sufficient capital to become a co-purchaser. With Fleisher he made a joint offer of $1,100,000, on November 27, 1961, at the same time holding to the personal belief that the business was worth $3,000,000. He did not remember having told the directors what he thought the business

was worth, although he admitted having advised Fleisher that there was a hidden profit in the stated inventory, the whisky having an actual value of $1,438,000. In his testimony given at the rehearing before Judge Burke, he admitted that he wanted the business sold to the Fleisher-Pearlstine group because he was to be hired by them. It is against this background of family interest and personal motivation that the Jacobs exceptions should be appraised.

The three remaining trustees have all approved the sale to Publicker for $1,411,000. In addition, Mrs. Jacobs' three sisters, who with her comprise the four life-tenants, and all of their adult children, have approved the sale. Two of the sisters, Mrs. Schneider and Mrs. Makransky, are represented by counsel of record who have actively supported the sale in these proceedings.

Exceptants do not claim the price inadequate. They could not. Upon the rehearing of the Jacobs' petition, two of their own expert witnesses, both former Schenley Distillers Corporation executives, estimated the company as presently worth between $900,000 and $1,000,000. These experts conjectured a "potential" value of $3,000,000 to $4,000,000 within three to four years, but this would depend upon an infusion of new capital or merger with a producing distillery. Exceptants' only bank witness mentioned a possible loan of $500,000 for one year, provided Dougherty could raise $400,000 from other sources. There was no evidence of a likely source for the $400,000 additional capital, and presumably Mr. Jacobs had thoroughly explored all loan possibilities in 1961. Names of manufacturing distilleries with whom a merger might be effected were not put on the record. Their existence remains purely hypothetical.

Even a doubling of earnings, by merger or otherwise, would not solve the problem pressing the trustees.

Mr. Zink, who is one of the trustees, a member of the bar and an expert on tax law, testified that even a doubling of earnings would help very little. If the earnings were $300,000 (which is almost twice the high-point to date), Dougherty would have to pay a Pennsylvania tax of $18,000 and a Federal tax of about $141,000. This would leave about $141,000 for distribution to the trust as a dividend; and on receipt of the dividend the trust would have to pay a Federal income tax of about $103,000 — which would leave $38,000 for payment of debts.

As well noted by the learned hearing judge, assuming that the hypothetical net income of $300,000 could be constantly maintained year after year, "it would require about a quarter of century to discharge the obligation of $915,000". No one has suggested that the Commonwealth and the Federal government would patiently wait for that length of time.

As pointed out by Mr. Latta in his very helpful and comprehensive brief, sale of the surplus inventory to free $400,000 of capital would be taxable as a dividend to the trust pursuant to section 316 (a) of the Internal Revenue Code of August 16, 1954, 26 U.S.C.A. §316 (a). If the distribution to the trust was all made in one year, he estimates the income tax at $338,000, which would leave only $62,000 for payment of debts. Admittedly, this small remainder would be ineffectual.

The record does not support the charge that the trustees in deciding to sell the business failed to exercise discretion, for all four trustees joined in the petition for the sale to Fleisher-Pearlstine at the then top price of $1,250.000. While 25 percent of the stock was reserved for a "put" of $350,000 payable at anytime within three years, the value of this added feature in the opinion of at least one trustee was most doubtful. Courts have experienced difficulty in evaluating a

minority interest in a close corporation, but all agree that the minority fraction must be discounted from its exact proportional value. Estimates of a proper discount range from 10 to 25 percent. See Gudebrod Esstate, 24 D. & C. 2d 517; Mohn Estate, 75 D. & C. 138; Wood's Estate, 29 Dist. R. 960; Bader v. U.S., 172 F. Supp. 833. It seems logical that the same economic forces which dictate the discounting of a minority interest, would militate against any increase of the "put" over its covenanted value of $350,000.

In ordering a cash sale of *all* the stock, Judge Burke was desirous of setting up uniform specifications which would appeal to *all* prospective bidders. Not one of the trustees raised an objection. Ostensibly, Mrs. Jacobs, as well as the other three trustees, was anxious to obtain the maximum price for the Dougherty stock. No one even suggested that inclusion of the "put" in the specifications would be an additional attraction to prospective bidders or more beneficial to the trust. Court approval of any sale by the trustees, in the absence of the Commonwealth's consent, was required by paragraph 2 of the "Security Agreement". How then can the action of the trustees in seeking court approval possibly be characterized as a failure by them to exercise proper discretion? Our Supreme Court has held that even where the parties have unnecessarily made their agreement of sale subject to approval of the court, the court's subsequent order is binding: Stone Estate, 358 Pa. 335, 337.

Clearly, Judge Burke's interlocutory decree was well within the authority which the legislature has granted this court in its "control" over all fiduciaries of inter vivos trusts: Orphans' Court Act of 1951, sec. 301 (6), 20 PS § 2080.301 (6). Judicial setting of the rules for a public sale is a proper exercise of control just as is this court's well recognized power to order a trustee to rent and use a safe deposit box. See Laverelle

Estate, 101 Pa. Superior Ct. 448 (allocatur refused, p. xxv).

While the trustees are authorized by the deed to "hold and retain . . . in their discretion" the Dougherty stock, their express liability for "gross negligence" would hardly justify the speculation now demanded by the Jacobs family. See Restatement, Trusts, 2d ed., § 227, comment *f.* and *u.* Upon due consideration of this whole record, it seems clear that the Jacobs family are chasing a will-o'-the-wisp, for Fleisher-Pearlstine refused to enter into competitive bidding, or to increase their offer, but instead withdrew the same, demanded and received the return of their $50,000 check. These exceptants have failed to convince the three remaining trustees, or any of the judges of this court, that there is actually some way for this much harassed trust to have its "cake and its penny, too".

We have not overlooked the fact that the guardian and trustee ad litem has joined in the Jacobs' exceptions. His position is offset to some extent by the fact that all the adult remaindermen, other than Mrs. Jacobs' son, Robert Henry Jacobs, have joined the remaining life-tenants in approving the Publicker sale.

More persuasive, however, is the fact that settlor gave his four daughters the right to receive income of at least $5,000 per year, and to invade principal, if necessary, to obtain this minimum sum (page 2 of the deed of trust). The account now pending in this court shows they have received no income since 1951. Each daughter would now be entitled to more than $50,000 upon demand. It would be unjust to ignore the wishes of three life-tenants just because Mrs. Jacobs is willing to longer postpone her own claim. Even without this expression of preference by settlor, we would have to agree that these life-tenants have "starved" long enough: Nirdlinger's Estate (No. 2), 327 Pa. 171, 174.

It is for the above reasons that we unanimously concluded that all exceptions to the decree and opinion of the learned hearing judge should be dismissed.