**Stanley DIEFENTHAL, Executor of the Estate of Alma Diefenthal, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Stanley DIEFENTHAL, Executor of the Estate of Adolph Diefenthal, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 70–417, 70–418.**

United States District Court,
E. D. Louisiana,

May 8, 1972.

---

Moise S. Steeg, Jr., Steeg & Shushan, New Orleans, La., for plaintiff.

Charles G. Barnett, Tax Div., U. S. Dept. of Justice, Fort Worth, Tex., for the United States.

CASSIBRY, District Judge:

Stanley Diefenthal, in his capacity as testamentary executor of the estate of Alma M. and Adolph Diefenthal, sues to recover estate taxes and interest paid on a deficiency assessment levied on these estates.

Adolph Diefenthal died testate on July 22, 1965; shortly thereafter, on September 9, 1965, his wife, Alma Diefenthal, died testate. Their respective estate tax returns were timely filed. In each of these returns certain New Orleans real estate was included in the gross estate at a value of $146,000.00, and 2,000 shares of the capital stock of Southern Scrap Material Company, Ltd., (SCRAPCO) were included at a value of

$676.39 per share. The Commissioner of Internal Revenue appraised the real estate for $200,000.00 and the stock at $1,519.35 per share, and assessed a deficiency accordingly.

Plaintiff then paid the assessment in each estate, filed a claim for refund, which in due course was denied by the Commissioner. An action to recover refund of the sums paid, with legal interest, was filed for each separate estate and then consolidated into these proceedings.

■ Property includable in the gross estate of a decedent shall be taxed as at the time of the death of the decedent or the alternate date provided by the regulations. In this case, there is sufficient proximity in the date of death of the two decedents (July 22nd and September 9th) that a single valuation for each estate is clearly in order.

■ The test established by the Internal Revenue Code and Regulation 59–60 is the "fair market value" on the crucial date. Fair market value is defined as the price which "a willing buyer" would pay a "willing seller," neither being under compulsion to buy nor sell and both being fully informed. Revenue ruling 59–60 (26 CFR 2031–32) specifically applies to the valuing of stock in closely held corporations. The Commissioner's finding is presumed correct, and the burden of proof rests on the plaintiff. Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184 (1927); Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Niles Bement Pond Co. v. United States, 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901 (1930); United States v. Strebler, 313 F.2d 402 (C.A. 8 1963).

### REAL ESTATE

■ The issue with respect to the real estate can be readily disposed of. The value in the return was based upon an appraisal of Eugene Aschaffenberg, a local appraiser. This written appraisal was admitted in evidence without objection as was the appraisal by the Commissioner's expert, W. E. Pope. Aschaffenberg's appraisal was $147,000.00 and Pope's appraisal was $153,000.00. When two appraisals are less than five percent apart there is basically no difference between the two, and I have no hesitancy in reaching a value for this real estate falling equally between these two appraisals. Thus, I find that the value of the New Orleans real estate is $150,000.-00.

### SOUTHERN SCRAP MATERIAL COMPANY, LTD., STOCK

The determination of the value of the capital stock of Southern Scrap Material Company, Ltd., is more difficult and complex.

With respect to SCRAPCO stock, Revenue Ruling 59–60 sets out many relevant factors to be considered in determining the value of shares of stock in a closely held corporation, and provides:

"No general formula may be given that is applicable to the many different valuation situations arising in the valuation of such (closely held) stock".

■ The jurisprudence, although presenting instances where the Internal Revenue Code and Regulation 59–60 have been applied, affords no settled legal standard to apply in a case such as this. Rather, valuation for tax purposes is a question of fact depending on the circumstances in the individual case. Penn v. Commissioner of Internal Revenue, 219 F.2d 18, 20–21 (9 Cir. 1955); Arc Realty Co. v. Commissioner of Internal Revenue, 295 F.2d 98, 103 (8 Cir. 1961); Snyder's Estate v. United States, 285 F.2d 857, 861 (4th Cir. 1961).

The evidence reveals the following facts concerning the background and general operation of SCRAPCO. It is a Louisiana corporation organized in 1900, and since then has continuously engaged in the scrap material business. By two of its subsidiaries, it expanded the scope of its operations from its industrial canal site to the westbank of New Orleans

(West Bank Metals, Inc.) and up river to Baton Rouge (Southern Scrap Material Co., Inc., Baton Rouge). SCRAPCO, at the time of Adolph Diefenthal's death, also owned one-half of the stock of Armstrong Equipment Company, a Birmingham, Alabama dealer in new and used machinery. All references hereafter to SCRAPCO, except where otherwise indicated, refer to the parent and these three subsidiaries.

SCRAPCO's principal business was the acquisition, processing and shipment of ferrous scrap metals. Apparently, the scrap business does not readily conform to general business practices and this has been emphasized by the testimony of Stanley Diefenthal, and confirmed by the experts testifying. It is necessary that SCRAPCO obtain, store and be prepared to process its scrap materials independent of existing orders. The material is acquired in this country when it is available at the then determinable price, and stockpiled. It is retained in large inventory quantities for disposition to SCRAPCO's customers, most of whom are in Japan, and who basically fix the demand for the commodity and are the sole determining factors in establishing its sales price. Although it appears that the inventory of SCRAPCO "turns over" several times during the year, it has been generally conceded that the large stockpiling of inventory is necessary for the business to meet promptly the call of its customers. The inventory, when obtained, is classified first between ferrous and non-ferrous metals, then graded and shipped after preparation and bailing.

To establish SCRAPCO's financial condition, the parties jointly offered the certified financial statements (balance sheet and profit and loss statement) of SCRAPCO and its subsidiaries for the years 1955 to and inclusive of the full year of 1965. A recapitulation of relevant portions of this information are as follows:

COMBINED SOUTHERN SCRAP METAL COMPANY, LTD; SOUTHERN SCRAP MATERIAL COMPANY, INC., BATON ROUGE; WEST BANK METALS, INC.

|      | NET WORTH | NET PROFIT BEFORE TAXES | NET PROFIT AFTER TAXES | GROSS SALES |
|------|-----------|-------------------------|------------------------|-------------|
| 1955 | 1,444,662 | 453,311 | 277,104 | 13,703,000 |
| 1956 | 1,758,802 | 611,980 | 312,508 | 20,607,000 |
| 1957 | 1,805,933 | 94,895  | 53,511  | 17,851,000 |
| 1958 | 1,864,720 | 91,937  | 57,103  | 5,217,000  |
| 1959 | 1,903,342 | 56,979  | 28,582  | 12,728,000 |
| 1960 | 1,927,058 | 28,855  | 23,716  | 12,622,000 |
| 1961 | 2,035,194 | 228,340 | 108,136 | 22,369,000 |
| 1962 | 2,126,403 | 86,177  | 59,078  | 8,054,000  |
| 1963 | 2,264,957 | 253,707 | 140,688 | 11,726,000 |
| 1964 | 2,556,262 | 524,801 | 283,144 | 14,262,000 |
| 1965 | 2,871,188 | 531,421 | 313,773 | 12,955,000 |
| Average earnings after taxes—1960–64 | | | | 127,000 |
| Average weighted earnings after taxes—1960–64 | | | | 162,000 |

This statistical summary of the balance sheets shows that there is no regular pattern of growth in SCRAPCO's background, but to the contrary, its sales and profits are sporadic. For example, in 1960 on sales in the amount $12,000,000 there was a net profit of $23,716; the very next year, profits were almost five times the 1960 profits ($108,136), but the increase in sales was less than double (from $12,622,000 to $22,369,000). Nor would the large profits in 1964 and 1965 be representative when in 1962 the net profits were only $59,078 and the evidence shows that a price decline had commenced in September 1965. When the end result of SCRAPCO's business is correlated with

its foreign sales and the export price, its dependence on the foreign market is apparent.

From time to time, prior to 1965, Stanley Diefenthal had created certain corporations which dealt exclusively with SCRAPCO. These corporations made profits by time chartering vessels and then entering into a voyage charter with SCRAPCO. Stanley Diefenthal was the sole owner of the stock of these corporations. Neither SCRAPCO nor the decedents owned any of this stock. Stanley Diefenthal would, from time to time, liquidate these corporations and the undistributed surplus would be distributed to him. He would then pay the appropriate income tax on such surplus. All of these corporations have been liquidated except Fukaya Trading Co. S.A. which also acted as foreign sales agent for SCRAPCO. (For convenience, I shall refer to these as Shipping Corporations). *The following is a summary of the appropriate income information with respect to these shipping corporations:*

| | FISCAL YEAR | NET INCOME AFTER TAXES | TOTAL |
|---|---|---|---|
| **Jamed Trading Co. Inc.** | | | |
| (Org. 12/14/60) | 9/30/61 | (36.78) | |
| (Liq. 9/22/64) | 9/30/62 | 12,616.59 | |
| | 9/30/63 | 3,426.92 | |
| | 9/22/64 | 10,235.86 | 26,242.59 |
| | | | |
| **Poseidon Chartering Co., Inc.** | | | |
| (Org. 8/27/62) | 5/31/63 | 5,100.31 | |
| (Liq. 11/30/64) | 5/31/64 | 11,922.41 | |
| | 11/30/64 | 1,228.76 | 18,251.48 |
| | | | |
| **Atlas Shipping Co., Inc.** | | | |
| (Org. 5/30/62) | 1/31/63 | 16,868.29 | |
| (Liq. 1/21/65) | 1/31/64 | 5,964.30 | |
| | 1/21/65 | 1,254.43 | 24,087.02 |
| | | | |
| **Terminal Metals Co., Inc.** | | | |
| (Org. 12/14/60) | 11/30/61 | (36.78) | |
| (Liq. 8/26/64) | 11/30/62 | 18,126.68 | |
| | 11/30/63 | (32.41) | |
| | 8/26/64 | 51,761.13 | 69,818.62 |
| | | | |
| **Fukaya Trading Co. S.A.** | | | |
| (Org. 11/6/63) | | | |
| (Earned Surplus 5/31/65) | | 161,580.20 | |
| (Earnings 6/1/65 to 5/31/66) | | 51,749.08 | 191,767.16 |
| | | | |
| TOTAL: | | | 330,166.87 |

The matter now reduces itself to the determination of these two questions:

(1) Eliminating the Shipping Corporations' income, what is the value of SCRAPCO's shares? and

(2) Should the Shipping Corporations' income be considered as SCRAPCO's income for the determination of the value of its shares, and if so, what then is the value of these shares?

■ There is no question that in a tax refund case the Commissioner's determination is *prima facie* valid, and to overturn it the plaintiff has the burden of proof. Wickwire v. Reinecke, *supra.* In this case, the plaintiff started with the premise that SCRAPCO's stock had no prior sales or established market value, and the Commissioner apparently agreed with this. The plaintiff then produced three experts to establish the

value of the shares: Leonard Glade, the certified public accountant who prepared the returns; John P. Labouisse, an investment counsellor; and finally, as a rebuttal witness, Professor Robert W. Elsasser, a local business analyst.

Leonard Glade is a certified public accountant who is now a senior partner in the National Accounting Firm of Alexander Grant & Company. He was the C.P.A. who prepared and filed the estate tax return in question here; he is also the regularly engaged certified public accountant for Stanley Diefenthal, for SCRAPCO, and for its local subsidiaries. Glade did not testify in court, his testimony was taken by a deposition that was offered in evidence. In essence he stated that (since SCRAPCO was in the business of buying and selling a commodity) he sought a basis in the jurisprudence which would be comparable with the corporation in this case, and concluded that Bader v. United States, 172 F.Supp. 833 (S.D.Ill.1959) was the nearest case. He then utilized the principles enunciated in *Bader* using his judgment to establish the percentage variables which are necessary to apply the *Bader* concept. Glade testified that the value of the· shares was $676.39 each, the same value reported in the estate tax return.

Plaintiff did not rest on Glade's evaluation at $676.39 per share, but produced the investment consultant, John P. Labouisse. Labouisse is an experienced investment advisor and a senior member of the established firm of Howard, Weil, Labouisse, Friedrichs & Company. I found him to be well qualified and it appeared that his opinions were based on careful analysis and study. Mr. Labouisse's written report is a part of the record and his testimony and the report indicates that Labouisse followed the guidelines of Regulation 59–60.

His conclusion was as follows:

"It is my opinion, all factors considered, that a fair value of 100% of the Southern Scrap Material Co., Ltd. would not exceed $1,800,000.00 which is over eleven times weighted average earnings for the five year period 1960–64 and is equivalent to 70% of the book value at December 31, 1964."

He further testified that there was no market for this stock, and accordingly, consistent with the testimony of Glade and Elsasser, he fixed a 10 per cent discount for the lack of marketability. This reduced the overall value of the 2,000 shares of SCRAPCO stock from $1,800,000.00 to $1,620,000.00, that is $810.00 per share.

Considering the testimony of Stanley Diefenthal regarding the background, nature and operation of SCRAPCO, sales, practices and the other elements with respect to the industry itself, and the testimony of Glade and Labouisse, it is my opinion that the plaintiff has sustained his burden of proof.

In order to support the deficiency assessment, the Commissioner introduced as its expert, Lonnie H. Pope; the estate tax agent who was responsible for fixing the assessment was not called as a witness. In my opinion, Pope did not sustain the Commissioner's position. For example, even though Regulation 59–60 provides that earnings as a factor are to be given greater weight when valuing stocks of companies which sell products or services to the public, and that conversely, in an investment type of company the appraiser may accord the greatest weight to the assets underlying the security, Pope was not familiar with this provision of the Regulation. When further questioned about other provisions of the Regulation he was unable to testify with respect thereto. Instead of considering the general period and background of SCRAPCO's financial history, Pope selected certain years and omitted others, apparently selecting those which better suited his conclusions. In direct examination, the primary effect of his testimony was to read from his written report, and on cross examination when this report was not available to him he answered unconvincingly. His original report contained arithmetical errors;

even though forewarned of these errors, his attempt to correct the arithmetical errors was again inaccurate and, when confronted with these mistakes, he could not explain or justify their existence. He sought to adjust SCRAPCO's book value by including projected lease values based on what he was "told" and on clearly unfounded assumptions.

It does not appear that defendant places any emphasis on his testimony, since in its brief there is no strong argument in support of his opinion. My own conclusion is that Pope's testimony is entitled to little, if any, weight.

Under all of these circumstances, I find the only substantial testimony is that of Labouisse, who reached the conclusion that SCRAPCO's shares were worth $810.00 each on the crucial date.

However, before reaching a final conclusion, it is necessary to consider the issue injected into this matter by the Commissioner at the trial. It is the Commissioner's contention that the income of the shipping corporations should be included as income of SCRAPCO when determining the value of SCRAPCO's stock. Although this issue had not been presented in the pre-trial order, and was objected to by plaintiff's counsel (which objection was made general), testimony was admitted for the reasons stated, that it appeared that the proper procedure was to allow any and all evidence which might be material in showing the true value of the property in question. In this connection, the Commissioner offered tax returns which established the income of these shipping corporations during their existence. The primary evidence with respect to the relevance of this income in evaluating SCRAPCO's stock again falls upon Labouisse. He stated that he would only consider this income if it appeared to him that such income was "siphoned off" from the income of SCRAPCO, and that before he could render an intelligent opinion, he would require more facts. However, when pressed, Labouisse did state that he felt that a purchaser would have to know all relevant facts and would take into consideration,

among other things, income earned by other entities whether SCRAPCO itself could have earned that income or could have avoided the expense.

It appears that the Commissioner contends that the consideration of this collateral income will increase the value of the stock, using $810.00 as a starting point, to $1156.50 per share. The plaintiff points out that accepting this premise *arguendo*, the income was incorrectly calculated because the wrong tax base was applied, and that if this income was taxed at the same rate as SCRAPCO's the value would be only $1,047.00 per share.

■ I do not agree with plaintiff's contention that I have to have evidence that the shipping corporation's income milked SCRAPCO. Since it is likely that a prospective purchaser might consider this intangible factor, it should be included as an element to be considered in reaching an overall value of the stock, but in no event fully considered because of its indeterminate stature.

■ Therefore, considering the nature of SCRAPCO's business, by capitalizing its income, exclusive of the collateral income, on a weighted average for 1960–65, giving consideration to its book value, and considering that the prospective purchaser should have an opportunity to give some weight to the collateral corporation (shipping corporations') income, I find that the shares of capital stock of Southern Scrap Material Company, Ltd. are worth in the aggregate $1,800,000 or $900.00 per share.

At the conclusion of the trial counsel agreed that, upon reaching findings of fact and conclusions of law with respect to valuation, it would be necessary that computation of the amount of the refund, if any, would be determined by the respective parties. Accordingly, the court retains jurisdiction of the matter and directs the plaintiff and the government to present a mutually agreeable computation based upon the findings herein so that a judgment may be entered in accordance with this opinion within thirty days from this date.