**Frederick G. KRAPF, Jr., and June B. Krapf, Plaintiffs–Appellees,**

v.

**The UNITED STATES, Defendant–Appellant.**

No. 91–5068.

United States Court of Appeals, Federal Circuit.

Oct. 22, 1992.

Thomas B. Rutter, Rutter, Turner, Solomon & Dipiero, Philadelphia, Pa., argued

for plaintiffs-appellees. With him on the brief was Dorothy M. Arimond.

Joan I. Oppenheimer, Atty., Dept. of Justice, Washington, D.C., argued for defendant-appellant. With her on the brief were Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and David English Carmack.

Before NIES, Chief Judge, PLAGER and ALARCON,[*] Circuit Judges.

NIES, Chief Judge.

The United States appeals from the United States Claims Court judgment in *Krapf v. United States*, 17 Cl.Ct. 750 (1989), which held that 26,000 shares of stock in Mechtron Industries, Inc. (Mechtron), donated to the University of Delaware (the University) by Frederick G. Krapf, Jr., on September 2, 1976, had a value of $112,840 ($4.34 per share) at the time of donation. We reverse and remand.

## BACKGROUND

On September 2, 1976, Frederick Krapf donated 26,000 shares of Mechtron common stock to the University. On their joint income tax returns for the next four years, the Krapfs valued the stock at $10.00 per share, apparently based on pre- and post-donation transactions at that price, and claimed a four year total of $260,000 in charitable deductions. After auditing the Krapfs, the Internal Revenue Service concluded that the Mechtron stock had no value at the time of donation and that the Krapfs were liable for income tax deficiencies and interest totaling $211,646.81.[1] The Krapfs paid the deficiencies and interest, and brought this suit in the Claims Court to recover all of the amounts paid.

During the course of trial, the government filed a motion in limine to limit the testimony of Mechtron's financial consultant to events occurring *before* the donation. After denying that motion, the Claims Court examined all Mechtron stock transactions, including those which oc-curred after the donation, and found the Krapfs were entitled to $4.34 per share as the value of the gift. This figure was based on a 1980 stock placement to Mechtron's founder, Edwin Pierce, at $10.00 per share, which was the sum of a cash payment and a conversion of debt owed to him by Mechtron, but with a substantial downward adjustment in the amount of the debt. While the 1980 placement to Pierce postdated the gift by some four years, the Claims Court concluded in substance that the stock went down in value after the gift and that the value obtained based on the 1980 Pierce transaction, therefore, provided a "floor" for the 1976 value. Under a rough adjusted net worth estimate for 1976, the Claims Court also came up with a figure "comparable" to the $4.34 per share value assigned to the 1980 Pierce transaction.

The Krapfs did not appeal the trial court's decision. The $4.34 per share value allows them to claim an income tax deduction of $112,840, thus entitling them to a refund of $60,572 in taxes and $31,766 in interest. The government, however, appeals asserting (1) that the court erred as a matter of law by admitting and relying on evidence of an event after the gift was made, (2) that the court made findings of fact which are unsupported by the record, and (3) that the court misunderstood some of the evidence.

## ISSUE

Whether the Claims Court committed reversible error in determining that the 26,000 shares of Mechtron common stock donated by Krapf to the University had a value of $112,840 ($4.34 per share) on September 2, 1976?

## DISCUSSION

### I.

#### *Mechtron's History*

Mechtron had a turbulent ten year history of existence. Organized as a subchapter

---

[*] Circuit Judge Arthur L. Alarcon of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1. The Claims Court and both parties present deficiencies and interest totaling $211,808.51. The discrepancy between this total and the IRS's $211,646.81 total is the result of typographical errors. The correct total is apparently $211,646.81, but for purposes of this discussion the discrepancy is immaterial.

S corporation in March of 1971, Mechtron's business was initially the design of scientific instrument chassis, which involved sheet metal work. The original investors, Messrs. Krapf, Pierce, and Winton, each invested $15,000 in Mechtron as principals in exchange for 26,000 shares each of Mechtron common stock. The stock was subject to a buy-sell agreement which gave Mechtron the right of first refusal. The agreement did not designate a fixed price for these shares of stock. Two key employees, Robert F. Engler, Jr., and James Olivere, Jr., received 1,000 shares of common stock each as an incentive to work for the corporation. In that same year, Mechtron borrowed $60,000 from the Delaware Trust Company on accounts receivable.

Mechtron expanded its business into supplying metal parts for rail cars. In late 1972, Mechtron entered into a contract with Amtrak to repair and refurbish Amtrak's dining cars. The contract, as well as the labor rate, was to be renewed yearly. Mechtron borrowed another $160,000 from the Delaware Trust Company in 1972.

The next year, Krapf and his sons merged their companies, Chesapeake Steel Inc. (Chesapeake) and Krapf Metal Sales (KMS), into Mechtron to inject needed capital into the struggling company. In exchange for Chesapeake and KMS, Krapf and his sons received 2,171 shares of Mechtron *preferred* stock. Mechtron was obligated to repurchase this stock by July 1, 1982, for its par value of $100 per share. The preferred stock also entitled Krapf and his sons to cumulative dividends at a rate of five percent per annum on its par value, payable on June 30 of each year beginning in 1973.[2] Although this merger was at least partially motivated by Mechtron's need to improve its financial statements in order to increase the amounts of its existing loans, Delaware Trust Company nevertheless denied Mechtron's next loan application. Mechtron then began borrowing money from Farmers Bank of Delaware. Mechtron's net income in 1973 was $59,183.

In 1974, Mechtron's rail division relocated from what was called the Bancroft site in Wilmington, Delaware, to a different facility, the B.F. Shaw plant. However, this plant, like the Bancroft site, was ill-suited for the rail car refurbishment business and thus limited Mechtron's profit potential. Mechtron financed its relocation through $2,130,000 worth of industrial revenue bonds from the State of Delaware. In the fall of 1974, when Engler was transferred from Mechtron to its subsidiary, Chesapeake, Mechtron offered to repurchase Engler's and Olivere's respective 1,000 shares of stock for $10.00 per share. Engler accepted, and Olivere refused the repurchase offer. Mechtron concurrently issued 1,000 shares of common stock to Roderick E. Bowden, Engler's replacement. Mechtron had a net income of $73,213 in 1974.

In 1975, Mechtron paid a $15,000 dividend on its preferred stock. Mechtron's directors revised the buy-sell agreement respecting their common stock to specify a price of $10 per share. The parties dispute, and the Claims Court did not decide, whether the agreement was signed by Winton before his death in 1975. Both parties, however, acknowledge that the agreement was disregarded by the directors upon Winton's death to allow the free transfer of Winton's stock to his son. Mechtron's 1975 net loss was $231,831.

In 1976, Mechtron hired a consulting firm, Ford, Bacon & Davis (FBD), to advise Mechtron on how to increase its car output. Most of FBD's proposed suggestions, included in a report dated April 6, 1976, were not implemented due to inadequate capital and the physical limitations of the plant. In May of that same year, Farmers Bank disallowed any further borrowing on Mechtron's accounts receivable. This exacerbated Mechtron's cash problems by creating a cash flow spiral—because Mechtron could not keep parts in inventory, its turnaround repair time was impaired, resulting in less incoming cash, which, in turn, decreased its ability to purchase more inven-

---

**2.** The Claims Court determined that Mechtron was not in default of the dividend payments on the preferred stock at the time of the donation of common stock in 1976.

tory. On August 9, 1976, Krapf resigned from Mechtron. On September 2, 1976, Krapf donated his 26,000 shares of Mechtron common stock to the University. Sometime in September or October 1976, Mechtron was informed of problems with keeping its Amtrak contract. In addition to the problems caused by Mechtron's poor production, Amtrak was receiving union pressure to select another repair facility as Mechtron was not a unionized plant. In December of 1976, Mechtron lost the Amtrak contract, which at that time constituted 90 percent of its business. Mechtron's 1976 net loss was $384,000.

Mechtron then entered the heavy equipment repair business. In 1977, Mechtron had a net income of $125,000 and a capital deficiency of $275,000. In 1978, its net losses totaled $957,000 and its capital deficiency was $1,255,000.

In 1979, Mechtron began building rail cars from kits imported from Rumania for North American Railroad. It also retained Dr. Nisson Finklestein as a financial consultant and corporate officer. Dr. Finklestein renegotiated the North American Railroad contract but, even after doubling the price per car, he estimated a $2,000 per car loss. He also suggested that Pierce reacquire the stock donated by Krapf to the University. On June 28, 1979, Pierce offered $10,000 to the University stating that the stock was of "no present value to anyone except me." The $10,000 for the 26,000 donated shares breaks down to $0.40 per share.[3] The University accepted the offer and sold the stock to Pierce. Pierce, that same year, sold Dr. Finklestein 100,000 post-split shares at $0.04 per post-split share ($0.40 per pre-split share).

To bring in needed capital, Dr. Finklestein arranged a sale of 600,000 newly-issued shares of stock to outside investors at $1 per share ($10 per pre-split share) in June of 1980. These investors signed a statement acknowledging that they knew

of the 1978 operating loss of $957,000, the 1979 operating loss of $500,000, the losses for the first five months of 1980, the accounts payable for $1,000,000, and Mechtron's delinquent loan payments to the Economic Development Agency, the Small Business Administration, the State of Delaware, and the Farmers Bank. Dr. Finklestein himself took 50 percent of his fee in newly issued stock. There were, in this time frame, discussions of merging with an unrelated company. Also in June 1980, Pierce cancelled $288,000 of debt owed to him by Mechtron, invested $50,000 in cash, and received 338,000 new shares. The Claims Court found that this amounted to a cash payment of $1.51 cash per pre-split share and a debt cancellation of $8.49 per pre-split share[4] for a total of $10 per share. However, the Claims Court discounted the debt by two thirds to $2.83 per share, resulting in a transaction value of $4.34. In early 1981, Mechtron entered Chapter 11 bankruptcy.

## II.

### Standard for Determining Fair Market Value of Charitable Contributions

Treas.Reg. § 1.170A–1(c)(1) states that the amount of a charitable contribution is the fair market value of the property at the time of the contribution. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas.Reg. § 1.170A–1(c)(2). In the absence of actual sale prices or bona fide bid and asked prices on or about the time of the donation, the fair market value of stock is to be determined by taking into consideration factors a willing buyer or seller would need to make an informed decision, namely the company's

---

**3.** By this time, the Mechtron stock had split ten for one. Thus, the 26,000 donated pre-split shares became 260,000 post-split shares and the $10,000 offer translates to $0.40 per pre-split share or $0.04 per post-split share. Unless otherwise specified, the terms "shares," "donated

shares," and "pre-split shares" refer to the shares before the split.

**4.** It appears that the correct numbers would have to be $1.48 cash and $8.52 debt cancellation per pre-split share.

net worth, prospective earning power, dividend-paying capacity, and other relevant factors, such as the good will of the business, economic outlook in the particular industry, the company's position in the industry, the company's management, the degree of control of the business represented by the block of stock to be valued, and the value of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. *See* Treas.Reg. § 20.2031–2(f); Treas.Reg. § 25.2512–2(f).

Neither party disputes that the Krapfs are entitled to claim a charitable deduction equal to the fair market value of the donated stock at the time of the donation.

### III.

### *Standard of Review*

The criteria by which a court determines the value of a charitable donation is an issue of law which we review *de novo* on appeal. *See Powers v. Commissioner,* 312 U.S. 259, 260, 61 S.Ct. 509, 510, 85 L.Ed. 817 (1941); *Estate of Palmer v. Commissioner,* 839 F.2d 420, 423 (8th Cir. 1988). Specific factual findings made in route to determining the value, as well as the value assigned to the donation itself, are reviewed under the clearly erroneous standard. *Trust Servs. of Am., Inc. v. United States,* 885 F.2d 561, 568 (9th Cir. 1989); *Estate of Palmer,* 839 F.2d at 423; *Orth v. Commissioner,* 813 F.2d 837, 838, 842 (7th Cir.1987).

### IV.

### *Admissibility of Evidence of Post–Donation Transactions*

The Claims Court relied on a 1980 transaction involving Mechtron stock as evidence of the value of the donated stock on September 2, 1976. The government argues that this evidence was inadmissible under controlling precedent.

The Claims Court ruled that the valuation of closely held stock must generally be made without reference to events which occur after the date of the donation, citing *inter alia, Fehrs v. United States,* 223

Ct.Cl. 488, 620 F.2d 255, 264 n. 6 (1980); *Estate of Ridgely v. United States,* 180 Ct.Cl. 1220, 1237–39 (1967); *Central Trust Co. v. United States,* 158 Ct.Cl. 504, 305 F.2d 393, 403 (1962); *Grill v. United States,* 157 Ct.Cl. 804, 303 F.2d 922, 927 (1962). As "exceptions" to this general "rule," the Claims Court further stated that post-donation data may be used in valuation only where: (1) no material change of circumstances or conditions in the corporation has occurred between the time of donation and the time of the post-donation evidence, or (2) the post-donation changes could have been foreseen at the time of the donation. 17 Cl.Ct. at 762 (citing *Estate of Ridgely,* 180 Ct.Cl. at 1237–38). After finding that the second exception did not apply in this case, the Claims Court invoked the first exception to admit and rely on evidence of the Pierce transaction in 1980. The Claims Court found there was a "relatively steady or continuing decline" in the value of Mechtron's stock after the donation in 1976. 17 Cl.Ct. at 762–63. Thus, per the Claims Court, this downward trend meant that the stock was worth more in 1976 than in 1980 and the Krapfs were entitled to use the value of the stock in 1980 as its fair market value in 1976. In effect, the Claims Court held that a downward trend is not a material change and a willing buyer would have paid at least that amount.

The government makes a number of attacks on the Claims Court's valuation. It initially argues that the "rule" stated by the Claims Court from distillation of the case law excludes consideration of post-donation sales of stock in connection with the fair market valuations if the corporation has had any significant change in circumstances, even downward. Such a rule would be grossly unfair. If the taxpayer can prove that the evaluation at the time of the gift is *at least* that of a later transaction, we can see no logical reason to bar acceptance of such transaction as the "floor" for the evaluation, even where there has been a material change in the corporate business. At least, the government cannot claim it is prejudiced by the

use of the low figure as the fair value for the earlier gift. The Claims Court's logic on this point cannot be faulted. Nevertheless, we do not adopt the Claims Court view that there is an exclusionary rule with two exceptions respecting admissibility of evidence of post-donation data and events. The question respecting such evidence may involve its relevancy, *i.e.*, its admissibility, but more usually the question is the evidence's probative value. The post-transaction evidence must always be proffered, of course, in support of finding the value of the stock on the donative date.

■ Evidence of post-transaction events may or may not be *relevant* depending on what events are sought to be proved. Where there was a series of arms length sales at the same price before and *after* the donation, such evidence might well give rise to an inference that the gift had the same value and, thus, would be admissible. Such a situation would likely fit into the second "exception" noted by the Claims Court, but we conclude that the "rule" of exclusion is simply the usual rule of relevancy. Further, even if relevant, the evidence may have little probative value. On the other hand, evidence of a post-gift sale price may give rise to an inference of the stock's earlier value, in light of other circumstantial evidence.

The four United States Court of Claims cases cited by the government as support for a "rule" against the admission of all post-transaction evidence in evaluating the gift do not so hold. In *Grill v. United States, supra,* one of the cited cases, the question was whether certain proceeds from the distribution of "Gone With the Wind" were ordinary income or capital gains. The Court of Claims did not exclude evidence respecting subsequent success of the motion picture but merely noted that the evidence was entitled to "very little weight." *Grill,* 303 F.2d at 927. This case is clearly not support for a *per se* exclusionary rule.

In *Central Trust Co. v. United States, supra,* the Court of Claims rejected appraisals by plaintiffs' experts regarding the value of a gift because of the use of post-

transaction data respecting general market trends which would not have been available to a prospective purchaser. Again, the court approached the question of exclusion with reason not with a *per se* rule. *Central Trust Co.,* 305 F.2d at 403.

Both of the above cases cite *Bader v. United States,* 172 F.Supp. 833, 840 (S.D.Ill.1959), for its holding that valuation "must be made as of the relevant dates without regard to events occurring subsequent to the crucial dates." It is correct that in *Bader,* certain testimony was excluded as "not pertinent to the issues," *id.,* but the opinion provides no enlightenment on the nature of the events sought to be proved by the excluded testimony. We fully agree with the general principle of *Bader* that subsequent events cannot change a proper evaluation. However, *Bader* cannot be read to extend to exclusion of evidence of a post-donation transaction which may provide a parameter or give rise to an inference of the earlier value. Moreover, a broad reading of these cases would prohibit post-transaction evidence under all circumstances, as neither *Grill, Central Trust Co.,* nor *Bader* mentions any "exceptions." Thus, the government's reliance on *Bader* for an exclusionary rule is neither warranted or necessary.

In *Estate of Ridgely, supra,* which the Claims Court cites as the basis for the exceptions to the exclusionary rule, the Court of Claims had admitted the government's post-transaction evidence. The government attempted to show a high fair market value of certain transferred land for estate tax purposes based on a post-transaction sale of the land to a third party, a large corporation, together with evidence that commercial use of the property was foreseeable. The Court of Claims rejected the government's evaluation because of dramatic changes in circumstances (the adjacent city spent over $900,000 for extensions of sewer and water systems to entice the corporation to purchase the land) which could not have been reasonably foreseen at the time of the land's transfer. *Estate of Ridgely,* 180 Ct.Cl. at 1239.

We conclude that the case law respecting evidence of events after a gift cannot be extrapolated into an exclusionary rule with two exceptions. As this case illustrates, the situations involving the determination of when such evidence is relevant are too varied to be confined by such rigidity. More appropriately, the stated exceptions, namely, where there is no material change in the corporation between donation and subsequent sale or where the changes would be foreseeable, simply illustrate two situations when post-transaction evidence should be considered.

The most recent Court of Claims case cited by the Claims Court and the government relating to exclusion of post-transaction evidence is *Fehrs v. United States, supra.*[5] There, the taxpayers' expert, in attempting to establish the fair market value of donated stocks, based his calculations on earnings achieved *after* the date of the transaction. The Court of Claims ruled, unremarkably, that the expert's use of post-transaction earnings was error because the earnings would not have been known to a prospective purchaser on the critical date, citing *Central Trust Co., supra. Fehrs*, 620 F.2d at 264–65 n. 6. *Fehrs* does not preclude consideration of post-transaction evidence in appropriate circumstances.

 While we conclude that the Claims Court did not commit legal error by admitting or considering post-donation evidence in connection with determining the value of the donated stock, we find its exclusionary rule with two exceptions to be an oversimplification of the rules of relevancy and we do not endorse it.

5. Although *Murray v. United States*, 687 F.2d 386 (Ct.Cl.1982), is a more recent case dealing with post-transaction evidence, the government does not cite *Murray* as support. We nonetheless note that *Murray* merely illustrates one circumstance where post-transaction evidence may be irrelevant. In *Murray*, the value of the gift trust was dependent on the trust's obligation to pay the donor's estate tax, which was, in turn, dependent on how long the donor would live after the gift completion date. When the gift was completed, the donor was still alive and had a life expectancy of 2.7 years. The donor's sudden death the day after the gift was complet-

## V.

### *The Finding of $4.34 as a Minimum Per Share Value is Clearly Erroneous*

 The evidence of record discloses the following stock transactions over the years:

March 1971—shares acquired at approximately $0.58 per share (26,000 shares in exchange for the $15,000 initial investment).

Early 1971—1000 shares each given to employees, Engler and Olivere.

March 1975—repurchase of shares from Engler at $10 per share.

September 2, 1976—date of Krapf's gift of 26,000 shares to the University.

June 1979—University sold shares at $0.40 per share to Pierce who resold 10,000 (pre-split) shares to Dr. Finklestein at $0.40 per share.

June 1980—$10 per share to new investors and to Pierce who paid $50,000 cash and cancelled debt to Mechtron which together total $10 per share.

The Claims Court rejected all of the putative $10 per share sales as evidence of fair market value for various reasons,[6] and as indicated, the Krapfs no longer attempt to justify that figure. The Claims Court also rejected the two sales at $.40 per share (which it treated as a unitary transfer) stating:

[T]he government failed to provide any support for this sale being a fair market value of the stock in 1976 or 1979. The fact that the University acquired the stock as a gift and was not in the busi-

ed did not justify reconsideration of the tax liability determinations. *Id.* at 395.

6. For example, the Claims Court refused to use the repurchase from Engler as evidence of the value of the stock because: (1) the payment to Engler was largely based upon his work and not the value of the stock; (2) the transaction was not at arms' length in view of the personal relationship between Engler and the Mechtron officers; (3) Mechtron's officers did not undertake valuation when making the repurchase offer; and (4) the Amtrak cancellation threat had yet to materialize.

ness of stock speculation also undercut this transaction's determinative quality. 17 Cl.Ct. at 763.

The Claims Court then constructed what it considered a minimum value based on the 1980 stock acquisition by Pierce. The Claims Court found Pierce acquired 338,000 post-split shares in exchange for $50,000 in cash and cancellation of Mechtron's debt to him in the amount of $288,000. *Id.* Together this resulted in a consideration facially amounting to $10.00 per pre-split share, made up of $1.51 cash and $8.49 debt cancellation.[7] The Claims Court then discounted the debt cancellation portion of the payment to one third of its face value, $2.83 per share, recognizing that the dire straits of the company decreased the value of the debt owed to Pierce well below its face value. *Id.* Adding the $1.51 cash per share to the $2.83 debt cancellation per share and finding a downward trend, the court held that on September 2, 1976, the donated shares of stock were worth at least the $4.34 per share consideration given by Pierce in 1980. *Id.*

As an initial matter, the amount of reduction in the worth of the company's debt to Pierce and the resulting stock valuation are highly speculative. It is undisputed that no one testified in support of either the $2.83 debt value or the $4.34 per share value.[8]

The government, pointing to Pierce's testimony that he did not recall paying $50,000 for stock in addition to the capitalization of his loans, argues that the Claims Court mischaracterized the transaction by including a $50,000 cash payment. Instead of pointing to any evidence in the record supporting inclusion of this cash purchase, the Krapfs merely point to the Claims Court decision for support. After examining the limited record on appeal, we cannot find any support for the payment.

But even if $50,000 is calculated into the 1980 placement to Pierce, we find persuasive the government's argument that the 1980 Pierce transaction does not indicate the fair market value of the stock because of Pierce's strong emotional ties with Mechtron. Pierce testified that he looked at Mechtron as his personal future. He also stated that "I was willing to sell my house and put everything into [Mechtron], if I had to." Moreover, Pierce testified that the June 1980 transaction was to act as a loan to Mechtron "to try to help it get on its feet." The stock was apparently included in the transaction to give Pierce, who had guaranteed one hundred percent of the loans, more control.

Part of the willing-buyer/willing-seller analysis requires that neither party be under any compulsion to buy or sell. This aspect of the willing-buyer/willing-seller analysis insures that the value of the stock is realistic in light of true market conditions. However, the value obtained from the cancellation of questionable debt in exchange for stock is not probative for purposes of establishing the fair market value of the stock where, as here, the "willing buyer" was the company's founder who has placed years of effort into the company and would admittedly go to great lengths in an effort to secure its survival. Moreover, the transaction was not an ordinary sale of the stock but instead was part of a plan for recapitalization.

In addition, we conclude that the finding by the Claims Court that "the post-gift transactions occur[red] during a period of relatively steady and continuing decline between the date of the gift and the final bankruptcy" is clearly erroneous. Without this finding, the evidence of value in 1980—even if correct—loses its probative force.

After the gift, the company's fortunes took a turn for the worse upon losing the Amtrak contract. It then took on a new business for which it was ill equipped. However, from the facts that a consultant, Dr. Finklestein, was hired who invested in the company himself, and new investors were secured, the inference is inescapable

---

7. *See supra* note 4.

8. Per the Claims Court, the government's witness, Mr. Ohanian, testified for a larger debt discount factor and the Krapfs' witness, Dr. Finklestein, testified for a smaller debt discount factor.

that the future must have looked more promising at times between 1976 and 1980. While such optimism may not have been justified by the balance sheets, the inference that there was a steady decline in the value of the stock between 1976 and 1980 is unsupported by the record. The period was one of highs and lows, the gift occurring in a low period. Even if the 1980 transaction had also occurred in a low period, the intervening events destroy the idea that the 1980 transaction was at the end of a steady declining slope and, therefore, provided a "floor" for the 1976 gift evaluation.

A more plausible "floor" would be the 1979 transactions involving the University and Dr. Finklestein at $0.40 per share. The 1979 repurchase from the University, unlike the 1980 Pierce transaction, occurred between Pierce and an outside party. Additionally, the 1979 repurchase was entirely for cash, not the cancellation of questionable debt. Moreover, contrary to the Claims Court, we do not assume that the University of Delaware is not sufficiently experienced in the investment of stock so that the price at which it sold the stock does not reflect a reasoned decision as to its fair market value. Similarly, we cannot agree that because the University received the stock as a gift it would not attempt to obtain the highest possible price for the stock from a third party. Thus, the figure of $0.40 per share appears to be a reliable evaluation in June 1979. Whether there is sufficient evidence to use that figure as a "floor" for the stock value in September 1976, we leave to the Claims Court to determine on remand.

## VI.

### Adjusted Net Worth Analysis

To support the $4.34 per share valuation based on the 1980 Pierce acquisition as adjusted, the Claims Court performed a rough adjusted 1976 net worth analysis of Mechtron and concluded that the value of the donated stock arrived at by this method would be "comparable" to the value resulting from its evaluation of the 1980 stock

transaction. 17 Cl.Ct. at 767. The Krapfs rely on this analysis by the Claims Court as an alternative basis for upholding the judgment although the court itself clearly did not make its net worth determination a basis for decision.

In making its net worth analysis, the court viewed Mechtron as a "going concern" at the time of donation and stated that net worth for a going concern is to be calculated by subtracting *long term* liabilities from assets. The Claims Court's calculations resulted in Mechtron having a 1976 adjusted net worth of $103,002. Because the 26,000 donated shares represented one third ownership of the company, the Claims Court found that, before taking other aspects of Mechtron's business into consideration, the donated shares had a book value of $34,334.00, or $1.34 per share. The Claims Court discounted this value by approximately one third to account for the amount of shares being a minority interest, the outstanding preferred stock which had potential voting rights, and the poor condition of Mechtron's management and facilities. This reduced the net worth evaluation to $0.92 per share.[9] The Claims Court then stated that "[i]f good will and market share are assigned a value and this value is added to the $0.92 a share, the final value would be comparable to the court's finding of $4.34 per share." 17 Cl.Ct. at 767.

The government argues that the Claims Court, when making the adjusted net worth analysis, erred by failing to fully include in Mechtron's liabilities the value of outstanding shares of preferred stock which Mechtron was obligated to repurchase in 1982. While the court stated it took the preferred stock into account, we agree with the government that its significance had to have been greatly underestimated. If the total value of the preferred stock, $217,000, had been included as a liability, Mechtron's net worth would have been a negative $113,-998, instead of the positive $103,002 figure used by the Claims Court. Moreover, the Krapfs present no reason for reducing Mechtron's commitment to buy back this preferred stock to approximately fifteen per-

9. We are unable to determine exactly how the Claims Court got its precise figures.

cent of its value in determining the Krapfs' share of corporate assets.

The government also points to the Claims Court's estimate of the value of good will and market share in the $4.34 value although the court had stated that it would not speculate as to such value. Specifically, the Court had noted, "although [the Krapfs] argued that Mechtron was a going concern, they did not attempt to establish an intangible asset value. Considering the corporation's difficulties ... the court will not speculate as to such value." 17 Cl.Ct. at 766–67. Indeed, intangible assets, such as good will and market share, would have to have been valued at over $900,000 in order to achieve the $4.34 value estimated by the Claims Court.

The net worth calculations are not supported by any evidence of record, as the trial court recognized. They were intended to be simply a rough estimate to support previously found value based on the 1980 sale to Pierce. Thus, contrary to the Krapfs' argument, the net worth analysis of the Claims Court does not provide an alternative basis for upholding the judgment. While the Claims Court has discretion in choosing a method of evaluation and some leeway in determining the amount of fair market value, the court correctly held it has no discretion to make a finding of the value of an asset where there is *no* evidence to support it. Thus, even assuming $0.92 per share is correct, there is no basis for increasing this figure to the $4.34 per share value which would be necessary to support the judgment.

## CONCLUSION

The judgment of the Claims Court is reversed and the case is remanded for a new valuation determination on the basis of the *existing* record consistent with this opinion.

## COSTS

Each party will bear its own costs.

**REVERSED AND REMANDED.**