**Frederic G. KRAPF, Jr., and June B. Krapf, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 187–85T.**

United States Court of Federal Claims.

March 19, 1996.

Frederic G. Krapf, Wilmington, Delaware, pro se, with whom was June B. Krapf.

Bartholomew Cirenza, Tax Division, United States Department of Justice, Washington, D.C., with whom was Michael L. Paup, Acting Assistant Attorney General, for defendant.

## OPINION

SMITH, Chief Judge.

This case concerns a claim for refund of $211,646.81 in taxes and interest. Plaintiff Frederick G. Krapf, Jr. donated 26,000 shares of Mechtron Industries, Inc., common stock to the University of Delaware on September 2, 1976, and plaintiffs claimed a charitable deduction of $260,000 on their joint tax returns on the assumption that Mechtron's shares had a fair market value of $10 per share. However, the Commissioner disallowed plaintiffs' deduction. Plaintiffs commenced this action to recover the amount paid, contending that the value of Mr. Krapf's shares at the time of gift was $10 per share. This court decided in *Krapf v. United States,* 17 Cl.Ct. 750 (1989) (*Krapf I* ), that the gifted shares were each worth $4.34, entitling plaintiffs to a deduction of $112,840. The United States Court of Appeals for the Federal Circuit reversed this court's opinion and remanded the case for a new valuation on the basis of the existing record. *Krapf v. United States,* 977 F.2d 1454, 1463 (Fed.Cir. 1992) (*Krapf II* ). After unsuccessful attempts to resolve this case through settlement, and consistent with the Federal Circuit's opinion, for the reasons set forth below the court finds that plaintiffs' shares were worth $2.46 per share at the time of the donation and that plaintiffs are entitled to a deduction in the amount of $63,885.

## FACTS

The court has previously recounted the pertinent facts in detail. *See Krapf I* at 753–54. In 1970, plaintiff Frederic Krapf was one of three co-founders of Mechtron Industries, Inc. At its inception, each of the founders contributed $15,000 in return for 26,000 shares of common stock. Although the company originally was in the business of designing scientific instrument chassis, the company in 1972 won a contract to repair and refurbish AMTRAK's dining cars, and the company began to devote more and more of its resources to servicing this contract. By 1973, more than 50 percent of Mechtron's business came from the AMTRAK contract, and by the end of 1976 90 percent of Mechtron's business came from the AMTRAK contract. However, in December 1976 Mechtron was informed that the AMTRAK contract would not be renewed, apparently because of pressure from labor unions (Mechtron was non-union and had resisted union organizing efforts), and because of continued production problems. Loss of the AMTRAK contract was particularly devastating because it generated so much of Mechtron's revenue and because Mechtron had made significant capital expenditures to service the contract.

In August 1976, prior to the AMTRAK contract cancellation, Mr. Krapf resigned from the board of Mechtron, and less than a month later, on September 2, 1976, he donated his 26,000 shares of common stock in the company to the University of Delaware. For the tax year 1976 through 1979, the plaintiffs claimed deductions in the amount of $260,000, or $10 per share, for the donated stock. The Internal Revenue Service disallowed all deductions for the gift on the grounds that the stock was worthless at the time it was donated to the University. Plaintiff paid the deficiency and interest and commenced the instant action.

In its original opinion, this court found that plaintiff showed by a preponderance of the evidence that the donated Mechtron stock was not worthless and that the company was a "going concern" at the time of the donation. *Krapf I* at 457–58. Next, in an effort to value the shares, the court evaluated several

pre- and post-gift share transactions to determine if any could provide a fair measure of the value of the stock when it was donated. After examining the pre-gift transactions and finding them of little assistance in valuing the stock on the date of gift, the court then examined two post-gift transactions in an effort to value the stock.[1] After first concluding that the fortunes of Mechtron had undergone a steady decline from its peak in 1975 until the company went bankrupt, the court found that any valid post-gift transaction could serve as a "floor," or minimum value, for its value on September 2, 1976, the date of the gift. That is, because Mechtron's value declined steadily after the gift, Mechtron's stock could have never been worth *less* on the date of gift than when a later, bona fide transaction occurred. The court then found that the 1980 stock purchase and debt cancellation by Mr. Edwin Pierce, Mechtron's president and one of its co-founders, was a bona fide transaction, and that the total value of the transaction was $4.34 per share. Given the steady decline in the fortunes of the company from September 1976 onwards, the court reasoned that Mechtron's stock must have been worth at least $4.34 in 1976. Thus, $4.34 served as a plausible floor value of the stock on the date of gift. Since plaintiffs provided no evidence of value above the floor, other than the $10 figure, which the court did not accept, the court found the fair market value to be $4.34.

The Federal Circuit ruled, however, that use of the 1980 Pierce transaction to value the donated stock was inappropriate, for several reasons. First, the Federal Circuit concluded that the valuation of the debt cancellation and thus the court's finding of the value of the stock were "highly speculative," and also concluded that there was insufficient evidence of the cash payment for the stock. *Krapf II* at 1461. Second, the Federal Circuit

cuit found that Mr. Pierce was not sufficiently disinterested to serve as a guide to Mechtron's fair market value. *Id.* Third, the Federal Circuit reasoned that, even if Mr. Pierce's transaction were disinterested, there was no support in the record for the finding that there was a steady decline in the fortunes of Mechtron. Rather, the Federal Circuit believed the evidence instead showed it to be a period of highs and lows, the gift being given during a low period, thus destroying the probative value of using the 1980 transaction as a floor for valuing the 1976 gift. *Id.* at 1462. The Federal Circuit suggested that a more plausible floor would be the 1979 Mechtron repurchase of the stock from the University of Delaware for $0.40 per share. *Id.*

The Federal Circuit also found that the adjusted net worth calculations, which this court found would yield a value of approximately $4.34 per share, were not sufficiently supported in the record to uphold this court's valuation. *Id.* at 1463. The Federal Circuit then reversed and remanded for a valuation based on the *"existing* record" (italics in original). *Id.*

## DISCUSSION

The court must determine, based on the *existing* record as required by the Federal Circuit, the value of a minority interest in Mechtron common stock donated to the University of Delaware on September 2, 1976. The value of a charitable contribution is the fair market value at the time of contribution. Treas.Reg. § 1.170A–1(c)(1). Fair market value is the price at which the property would have changed hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the

---

1. The court, citing *Estate of Ridgely v. United States,* 180 Ct.Cl. 1220, 1237–39, 1967 WL 8887 (1967), held that post-gift transactions were generally not to be considered subject to two exceptions: 1) there was no material change in the circumstances or conditions of the corporation between the valuation date and the post-valuation transaction; or 2) the subsequent information at the time of the post-valuation transaction could have been foreseen at the time of valuation. *Krapf I* at 762. The Federal Circuit found

that the evidence need not fall within these two categories mentioned in *Estate of Ridgely.* Rather, such evidence need only meet the standard test of relevancy, and the court may rely on such evidence if probative of the corporation's value at the time of the gift. *Krapf II,* 977 F.2d 1454, 1459 (Fed.Cir.1992). For purposes of this analysis, however, the test articulated by the Federal Circuit does not alter this court's conclusions about the probative value of either of the post-gift Mechtron transactions.

relevant facts. *Id.* § 1.170A–1(c)(2). In general, the fair market value of gifted property is discovered by examination of the entire record. *Skirpak v. Commissioner,* 84 T.C. 285, 320, 1985 WL 15315 (1985). Where the property in question consists of shares of stock that are not regularly traded on the open market, the court considers all circumstances connected with the corporation to determine the value of the stock. *O'Malley v. Ames,* 197 F.2d 256 (8th Cir.1952).

 Fair market value of unlisted stocks can be determined by examining actual arms length sales in the normal course of business. However, these sales must be for reasonable value and within a reasonable time before or after the date of gift. *Estate of Fitts v. Commissioner,* 237 F.2d 729 (8th Cir.1956). Absent determinative evidence from sales for reasonable value, the court must turn to other methods to value the stock. Section 20.2031 of the Estate Tax Treasury Regulations and Section 25.2512–2(f) of the Gift Tax Regulations list factors to be considered should external market data not be available. These are the factors that a willing buyer and seller would take into account in making an informed decision. The factors to be considered are: assets, earnings, earning potential, history of dividends, book value, character of management, competition, and "other factors." Estate Tax Treas Reg. § 20.231(f); Gift Tax Reg. § 25.2512–2(f); *Estate of Fitts v. Commissioner,* 237 F.2d 729, 731 (8th Cir.1951). ·

In its original opinion, this court looked at several transactions involving Mechtron stock that took place both before and after the September 2, 1976 gift of Mechtron stock. Because the Federal Circuit directed an evaluation based on the *existing* record, and because this court begins with the assumption that actual sales are the best indication of fair market value, *see Krapf I* at 760, the court will review these transactions once again to determine if any is helpful in determining the value of the gifted shares on September 2, 1976.

## A. Pre–Gift Transactions

 This court originally examined three pre-gift Mechtron stock transactions:

(1) Mechtron's 1971 capitalization at $0.58 per share; (2) the directors' alleged 1975 buy-sell agreement setting a $10 per share value; and (3) Mechtron's 1975 repurchase of 1,000 shares from Mechtron employee Robert F. Engler, Jr. and sale of 1,000 shares of stock to Roderick Bowden, Mr. Engler's successor, at $10 per share. As the court concluded in its original opinion, and upon further review of the record, these transactions are of little help in determining a specific value for the gifted shares of Mechtron stock. The $0.58 price per share of the initial capitalization was controlled by those receiving the stock. *See Krapf I* at 761. The alleged 1975 buy-sell agreement, for a variety of reasons, but primarily because of a lack of evidence that the agreement was in fact executed, provides no help whatsoever. *See Krapf I* at 761. The 1975 employee stock transactions are deficient as an indicia of value for several reasons: the transactions were not at arms-length, the evidence indicated that the payment to Mr. Engler was for work performed, not the value of the stock, the directors did not attempt to value the stock bought from Mr. Engler, and they occurred before the threat of losing the AMTRAK business became a concern for Mechtron. *See Krapf I* at 761–62.

These employee stock transactions do, however, buttress the court's finding that Mechtron was a "going concern" at the time of the gift. *See Krapf I* at 766 (finding Mechtron to have been a going concern on the date of gift). Mr. Pierce testified at trial that the offers to Mr. Engler and Mr. Olivere, the other Mechtron employee from whom the company offered to purchase 1,000 shares at $10 per share, and the grant of 1,000 shares to Mr. Bowden, represented the value of services each had rendered. *See* Transcript at 212. The evidence and logical inference, however, do not make this contention credible. First, Mr. Pierce was unable to explain why the diverse services of Messrs. Engler, Olivere, and Bowden were each worth exactly $10,000 ($10 × 1,000 shares). Second, the fact that Mr. Olivere rejected the offer of $10 per share strongly suggests that this was not a payment for services rendered. If this were such an in-

sider transaction designed to pay extra cash for services rendered, then it makes little sense why Mr. Olivere would reject the offer. Rather, the only plausible inference is that Mr. Olivere, far from believing the shares to be worthless, rejected the offer because he felt the shares were worth more than Mechtron was offering. Third, the grant to Mr. Bowden was made, according to Mr. Pierce, as "an inducement to keep [Bowden] on as vice president." *See* Transcript at 210. Mr. Bowden could hardly be induced to remain at Mechtron by shares that he believed worthless. All these factors strongly suggest that, just 18 months before the Krapf donation, Mechtron stock was valued at approximately $10 per share. While certainly not determinative of the price of the stock in September 1976 for the reasons mentioned above and in the court's prior opinion, the fact that the company had significant value only 18 months before the gift lends support to the finding that Mechtron was a going concern on the date of gift.

## B. Post–Gift Transactions

█ This court previously considered two Mechtron stock transactions that occurred after the date of the Krapfs' gift: (1) the 1979 repurchase of shares from the University of Delaware, and (2) the 1980 restructuring of Mechtron's stock. It was from the second of these transactions that the court, after finding a steady decline from 1976 onwards, found that the $4.34 per share value derived from the 1980 transaction was a floor, so that the September 2, 1976 value of the stock could not have been less than $4.34. The Federal Circuit, as discussed above, found that the 1980 transaction involving Mr. Pierce was not sufficiently disinterested, and that, even if it were disinterested, there was no support in the record for the steady decline hypothesis. *See Krapf II* at 1461–62. The court then suggested that the 1979 repurchase of shares from the University of

Delaware, at a pre-split share price of $0.40 per share[2] would be a more plausible "floor" for this court to consider.

The 1979 repurchase, however, does not provide a reliable value, largely for the same reasons the Federal Circuit found the 1980 Pierce transaction an unreliable indicator. If it is possible that the value of Mechtron was fluctuating between 1976 and 1979, rendering this court's floor hypothesis suspect, it stands to reason that the use of any other post-gift transaction is suspect for the same reasons. Moreover, it was the same Mr. Pierce, whom the Federal Circuit found not sufficiently disinterested regarding the 1980 transaction, who initiated the offer to purchase from the University of Delaware. (It was Mr. Pierce, and not Mr. Finklestein, who made the original offer to the University to buy back the stock.)

Ultimately, neither the 1979 University–Pierce transaction nor the 1980 Pierce transaction can fix a value to support an inference that the stock was worth at least that much on the date of gift. Because neither of these post-gift transactions, nor the pre-gift transactions previously discussed, is determinative of the value of the company on September 2, 1976, the court must examine other factors in an effort to value the stock.

## C. Other Factors—Adjusted Net Worth Analysis

In its prior opinion the court considered three methods of financial analysis,[3] each addressed by the government's expert, Mr. John Ohanian of Valuation Counselors. The court found that the adjusted net worth method was the most reliable way to determine Mechtron's fair market value at the time of the gift. *See Krapf I* at 764–65. Relying on Mr. Ohanian's and Valuation Counselors' analysis, and the court's finding that Mechtron was a "going concern" on the date of gift, the court concluded that the adjusted net worth method yielded a per

2. By this time, Mechtron stock had split ten for one, so that the University of Delaware owned 260,000 shares, which it sold back to Mechtron at $0.04 per share. In pre-split parlance this translates to 26,000 shares at $0.40 per share. For simplicity's sake all references in this opinion are to the pre-split share price.

3. The three methods were discounted cash flow analysis, comparable company analysis, and adjusted net worth analysis. *See* Def.'s Ex. 12 at 12; Def.'s Ex. 13 at 8.

share value of $1.34. *See Krapf I* at 766–67. The precise numbers the court relied upon are as follows:

| | | |
|---|---|---|
| ASSETS | | |
| Fixed assets: | | |
| Plants property, and equipment | $2,500,000 | |
| Tangible assets: | | |
| Tax credits and loss carryovers | $158,147 | |
| Intangible assets: | | |
| Goodwill and market share | $0 | |
| Net Working capital | ($384,973) | |
| TOTAL ASSETS | | $2,273,174 |
| LIABILITIES | | |
| Long term debt | $2,170,172 | |
| TOTAL LIABILITIES | | $2,170,172 |
| | | |
| ADJUSTED NET WORTH | | $103,002 |

*Id.* at 767, n. 10. The court then discounted this figure by one-third because the shares represented a minority interest in a closely-held corporation. *Krapf I* at 767. This resulted in a value of $0.92 per share, excluding the value of intangible assets such as market share and goodwill. *Id.* Lastly, the court estimated that by adding intangible asset values to the shares, the court would reach a per share value comparable to the $4.34 value supported by the transaction analysis.[4] *Id.*

The Federal Circuit found this court's conclusion to be flawed for several reasons. First, the Federal Circuit found that it was unable to determine the source of the figures used by this court. *See Krapf II* at 1462, n. 9. Second, the Federal Circuit found this court's rationalization of the difference between the $0.92 base figure (less intangible assets) and the $4.34 transaction-derived value inconsistent for two reasons: (1) the court attributed a high value to intangible assets even though it had excluded intangible assets from the analysis that derived the $0.92 figure, and (2) the court failed to offset seemingly speculative positive values with speculative negative ones, such as Mechtron's promise to repurchase Mr. Krapf's preferred shares by 1982. *See Krapf II* at 1462–63.

**D. Stock Value**

As a preliminary matter, the court notes that the figures relied upon by the court are derived from a January 1985 report prepared by Valuation Counselors, the company of defendant's expert witness. *See* Def.'s Ex. 12 at 27–28. Valuation Counselors provided a nearly identical analysis in its February 1986 report as well.[5] *See* Def.'s Ex. 13 at 13. The $2.5 million fixed asset figure is from Valuation Counselors' report: "[W]e have concluded that [the] estimated fair market value for continued use of the [property, plant, and equipment] as of September 2, 1976 was $2,500,000." Def.'s Ex. 12 at 27; Def.'s Ex. 13 at 13. The operating loss and tax carryover figure, $158,147, represents the sum of $132,962 and $25,185, which are Valuation Counselors' estimates, respectively, of the fair market value of Mechtron's accumulated losses (which could be used to offset earnings in later tax years) and the fair market value of Mechtron's $34,000 in remaining investment tax credits. *See* Def.'s Ex. 12 at 28; Def.'s Ex. 13 at 14. The net working capital figure, negative $384,973, is from the end-year 1976 balance sheet. *See* Def.'s Ex. 12 at 10; Def.'s Ex. 13 at A–2.[6] Finally, the long-

4. As discussed above, this court's original valuation of $4.34 was based on the 1980 Pierce transaction.

5. For the sake of clarity, references in the text are to the 1985 report, and the citations will cross-reference the 1986 report.

6. Although the balance sheet listed the capital deficiency as $384,973, defendant's expert used the figure $389,973 in its analysis of the adjusted net worth of Mechtron. *Compare* Def.'s Ex. 12 at 10; Def.'s Ex. 13 at A–2, with Def.'s Ex. 12 at 28; Def.'s Ex. 13 at 14. After a careful examination

term debt figure of $2,170,172 is from the end-year 1976 balance sheet. *See* Def.'s Ex. 12 at 10; Def.'s Ex. 13 at A–2.

■ While the Federal Circuit found the assignment of such a high value to intangible assets unsupported in the record, *see Krapf II* at 1463, this court does not understand the Federal Circuit's opinion to otherwise undermine this court's use of the adjusted net worth valuation, without consideration of speculative intangible assets. This analysis was convincingly presented by *defendant's* expert witness. Nor does the court understand the Federal Circuit's opinion to question this court's original finding that Mechtron was a "going concern" on the date of gift. In its adjusted net worth analysis, Valuation Counselors assumed that Mechtron was not a going concern and discounted the value of its fixed assets by a total of 25 percent to account for "liquidation cost" and "non-continued use" adjustments of 10 percent and 15 percent, respectively. *See* Def.'s Ex. 12 at 27; Def.'s Ex. 13 at 14. Because the court found that Mechtron was a going concern on the date of the donation, the court rejected the discounted valuation and adopted Valuation Counselors' assessment that the going concern value of these assets was $2.5 million (rather than the discounted $1.875 million).

In its original opinion, this court found that the net worth of Mechtron, excluding any intangible assets, was $103,002. However, upon further consideration of the data and analysis provided by Valuation Counselors and offered at trial, it appears that this court miscalculated the value of Mechtron, to plaintiff's disadvantage.[7] Valuation Counselors describes the adjusted net worth formula as "tangible and intangible assets plus new working capital, less net long-term debt." Def.'s Ex. 12 at 27; Def.'s Ex. 13 at 13. In figuring the adjusted net worth, Valuation

Counselors began with the net capital of Mechtron at the end of 1976. Mechtron's net capital—that is, the difference between liabilities and assets on its balance sheet—was actually negative: the company had a capital deficiency of $389,973 in 1976. It deserves mention that the capital deficiency figure represents the amount that all of Mechtron's liabilities, including its long-term debt of $2,170,172, exceeded total assets. Valuation Counselors then makes two principal adjustments. In the first, it compares the *discounted* value of the fixed assets, $1.875 million, with the book value of those assets, which is $1,973,319. Because the discounted value is $98,319 *less* than the book value, Valuation Counselors adds this deficiency to the capital deficiency of $389,973. Valuation Counselors then credits the value of operating loss and investment tax credit carryforwards against this deficiency. Under this analysis, Valuation Counselors arrives at an adjusted net worth of *negative* $330,145, which would obviously render the donated shares worthless.

Because this court finds that Mechtron was a going concern at the time of the gift, the court's analysis differs only in valuing the fixed assets at $2.5 million and not discounting, as Valuation Counselors did, for "liquidation" and "non-continued use." Without these two discounts, however, Mechtron had a positive value in 1976. Under the court's modified adjusted net worth analysis, Mechtron had a balance sheet capital deficiency of $389,973. Added to that is the difference between the actual value of these assets, $2.5 million, and the book value, $1,973,319. This amount, $526,681, is to be credited against the balance sheet deficiency, creating a positive value of $136,708. The fair market value of the tax credit and operating loss carryovers, $158,147, is then added to this figure, creating a positive value for Mechtron, under

of Mechtron's 1976 balance sheet, it appears that the transcription error is on Mechtron's balance sheet, and that the correct balance sheet capital deficiency is $389,973. The court will use this figure in its analysis in this opinion.

7. In its original opinion, the court overstated the liabilities of Mechtron. The capital deficiency is the amount by which total liabilities exceed total assets. It is not, itself, a liability. The court,

however, subtracted the value of the capital deficiency from the total going concern value of the assets, thereby understating the value of the company. The analysis in this opinion continues to use all the numbers provided by Valuation Counselors and the court's conclusions are the result of applying the same analytical process used by defendant's expert.

this modified adjusted net worth analysis, of $294,855 in 1976.

■ In 1976, Mr. Krapf owned 26,000 of 80,000 issued and outstanding shares of pre-split Mechtron common stock, or 32.5 percent of the equity in the company. The proportionate share based on the modified adjusted net worth analysis is $95,828 (32.5% of $294,855). As the court noted in its earlier opinion, however, Mr. Krapf is not entitled to a proportional share of the corporate asset value. Because Mr. Krapf owned a minority interest in a closely-held corporation, and for several other reasons, *see Krapf I* at 767, this court discounted the value of his shares by 33.3 percent. *Id.* After making this adjustment, the court finds that the stock is worth $63,885, or $2.46 for each of the donated shares. In accordance with the Federal Circuit's directive, and because plaintiff offered no evidence of intangible asset value, the court does not speculate as to the value, if any, of intangible assets.

■ The Federal Circuit also questioned this court's failure to reduce Mechtron's adjusted net worth by $217,000, the alleged market value of Mechtron's promise to repurchase Mr. Krapf's preferred shares by 1982.[8] After the large losses that were apparent in the fall of 1976, the directors would likely have breached their fiduciary duty to shareholders if they had repurchased Mr. Krapf's preferred shares at the redemption price of $100 per share in 1976. Under the preferred share agreement, Mechtron had until 1982 to make good on its promise. Because of these speculative conditions, it would be incorrect to say that Mr. Krapf's preferred share agreement should have been listed as a $217,000 liability on Mechtron's balance sheet. Indeed, the government's own experts, whose analysis the

court relied upon in determining the net worth of the company, acknowledged this by not listing the agreement as a liability on Mechtron's balance sheet or even mentioning the agreement in its adjusted net worth analysis. This is consistent with generally accepted accounting principles. *See Financial Standards Accounting Board, Accounting Standards: Current Text* 8301–03 (1989) (stipulating accrual requirement for probable, reasonably possible, and remote contingencies). Bearing in mind the Federal Circuit's admonition to decide this case "on the basis of the *existing* record," *see Krapf II* at 1463, the court declines to speculate on the detrimental effect of the repurchase agreement six years from maturity, particularly when defendant's own experts did not factor it into the adjusted net worth analysis upon which this court relies.

The Federal Circuit's opinion did not question either this court's adoption of the adjusted net worth analysis or its discount of 33.3 percent to account for Mr. Krapf's minority interest. The total value of the stock, $63,885, and the per share value, $2.46, are derived from the strongly supported inference from the record that Mechtron was a "going concern" on the date of gift, and from the analysis of defendant's expert. Indeed, the difference between the court's valuation of Mechtron ($294,855) and that of Valuation Counselors (negative $330,145) is merely the difference between the going concern valuation the court adopted based on Valuation Counselors' own estimate ($2.5 million), and the non-going concern value used by Valuation Counselors ($1.875 million). Lastly, consistent with the Federal Circuit's directive, the court will not speculate as to either the intangible asset value of Mechtron or to the

---

8. The present value of a lump sum payment in the future is not the dollar value of the future payment, but the future value *discounted* by the actual rate of inflation and the actual risk that the future payment will not occur. Because it is not possible to know the actual rate of inflation or the actual risk in advance, economists typically use the United States government long term bond rate as a surrogate for future inflation and factor in an additional discount to account for risk factors unique to the investment. In evaluating the precise value of Mechtron's preferred

share repurchase agreement, an economist would also have to consider the possibility that Mechtron could repurchase the shares before 1982 and the effect of provisions in the agreement granting Mr. Krapf the right to elect a majority of Mechtron's board of directors if Mechtron defaulted on three consecutive annual dividend payments. *See* Pl.'s Ex. 21 at 57. In its prior opinion, this court determined that Mechtron was not in default on preferred share dividends at the time of the gift. *See Krapf I* at 755–56, n. 2.

value of the agreement to repurchase Mr. Krapf's preferred stock.

### CONCLUSION

The court finds that actual sales of Mechtron are inconclusive as to the value of the Krapfs' shares on the date of gift. Accordingly, the court has turned to other methods of valuation. For reasons discussed in this court's prior opinion, the court determined that the adjusted net worth method of analysis was the best way to estimate Mechtron's value. This court performed such an analysis in its prior opinion and reached the conclusion that the base analysis plus intangible asset values produced a $4.34 per share value. After further review of the existing record, and a more rigorous application of the adjusted net worth analysis, the court finds that the value of the donated stock, excluding intangible assets and other speculative values not supported in the record, was $63,885 on the date of gift, and plaintiffs are entitled to a deduction in this amount.

The parties shall file within 60 days a stipulation as to the amount of refund to which plaintiffs are entitled based on this opinion.

**IT IS SO ORDERED.**